# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE DOLE FOOD CO., INC. STOCKHOLDER LITIGATION. | ) ) ) ) | CONSOLIDATED C.A. No. 8703-VCL |
| IN RE APPRAISAL OF DOLE FOOD COMPANY, INC. | ) ) ) ) ) | CONSOLIDATED C.A. No. 9079-VCL |

## MEMORANDUM OPINION

Date Submitted: July 2, 2015
Date Decided: August 27, 2015

Stuart M. Grant, Nathan A. Cook, Kimberly A. Evans, Michael Manuel, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Randall J. Baron, A. Rick Atwood, Jr., David T. Wissbroecker, Edward M. Gergosian, Maxwell R. Huffman, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Marc A. Topaz, Lee D. Rudy, Michael C. Wagner, Justin O. Reliford, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Class Counsel for Plaintiffs in In re Dole Food Co., Inc. Stockholder Litigation.*

Stuart M. Grant, Geoffrey C. Jarvis, Nathan A. Cook, Kimberly A. Evans, GRANT & EISENHOFER, P.A., Wilmington, Delaware; *Counsel for Petitioners Hudson Bay Master Fund Ltd., Hudson Bay Merger Arbitrage Opportunities Master Fund Ltd., and Ripe Holdings LLC in In re Appraisal of Dole Food Company, Inc.*

Kevin G. Abrams, J. Peter Shindel, Jr., Daniel R. Ciarrocki, Matthew L. Miller, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Counsel for Petitioners Merion Capital LP, Merion Capital II, LP, Magnetar Capital Master Fund Ltd., Spectrum Opportunities Master Fund Ltd., Magnetar Global Event Driven Master Fund Ltd., and Blackwell Partners LLC in In re Appraisal of Dole Food Company, Inc.*

J. Clayton Athey, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Peter M. Stone, Edward Han, PAUL HASTINGS LLP, Palo Alto, California; *Counsel for Defendants David H. Murdock and DFC Holdings, LLC.*

Bruce Silverstein, Elena C. Norman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Andrea E. Neuman, Colin B. Davis, GIBSON, DUNN & CRUTCHER LLP, New York, New York; William B. Dawson, GIBSON, DUNN &

CRUTCHER LLP, Dallas, Texas; *Counsel for Defendants C. Michael Carter and David A. DeLorenzo and Respondent Dole Food Company, Inc.*

Stephen C. Norman, Matthew F. Davis, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; David B. Hennes, Stephen M. Juris, Joshua D. Roth, Jesse Ryan Loffler, Andrew B. Cashmore, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP; *Counsel for Defendants Deutsche Bank AG, New York Branch and Deutsche Bank Securities Inc.*

**LASTER, Vice Chancellor.**

In November 2013, defendant David H. Murdock paid $13.50 per share to acquire all of the common stock of Dole Food Company, Inc. ("Dole" or the "Company") that he did not already own. Before the transaction, Murdock owned approximately 40% of Dole's common stock, served as its Chairman and CEO, and was its *de facto* controller. The transaction was structured as a single-step merger (the "Merger"). The Merger closed on November 1, 2013.

In his initial letter to Dole's board of directors (the "Board"), Murdock offered to pay $12.00 per share. Informed by then-Chancellor Strine's decision in *MFW*,[1] Murdock conditioned his proposal on (i) approval from a committee of the Board made up of disinterested and independent directors (the "Committee") and (ii) the affirmative vote of holders of a majority of the unaffiliated shares. Despite mimicking *MFW*'s form, Murdock did not adhere to its substance. He and his right-hand man, defendant C. Michael Carter, sought to undermine the Committee from the start, and they continued their efforts throughout the process.

Before trial, the allegations and evidence regarding Murdock and Carter's activities, together with the relationships between certain Committee members and Murdock, were sufficient to create triable questions of fact regarding the Committee's independence. The record at trial, however, demonstrated that the Committee carried out

---

[1] *In re MFW S'holders Litig.*, 67 A.3d 496 (Del. Ch. 2013), *aff'd sub nom.*, *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014). During the pendency of this case, the Delaware Supreme Court adopted then-Chancellor Strine's analysis.

1

its task with integrity. The Committee was assisted in this effort by expert legal counsel and an investment bank—Lazard Frères & Co. LLC ("Lazard")—that likewise acted with integrity. In contrast to a string of decisions that have criticized financial advisors for flawed and outcome-driven analyses,[2] this opinion can praise and rely on Lazard's thorough and balanced work product.

Because of the diligence of its members and their advisors, the Committee overcame most of Murdock and Carter's machinations. The Committee negotiated an increase in the price from $12.00 to $13.50 per share, which Lazard opined fell within a range of fairness. Several market indicators supported Lazard's opinion. Stockholders approved the Merger, with the unaffiliated stockholders narrowly voting in favor in a 50.9% majority.

But what the Committee could not overcome, what the stockholder vote could not cleanse, and what even an arguably fair price does not immunize, is fraud. Before Murdock made his proposal, Carter made false disclosures about the savings Dole could

---

[2] *See, e.g.*, *Koehler v. NetSpend Hldgs., Inc.*, 2013 WL 2181518, at *16-17 (Del. Ch. May 21, 2013) (reviewing details of "weak fairness opinion"); *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 441 (Del. Ch. 2012) (Strine, C.) (noting "questionable aspects" of banker's valuation); *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 771-73, 803-804 (Del. Ch. 2011) (Strine, C.) (critiquing misleading analyses prepared by financial advisor); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *10-11, *14-15 (Del. Ch. Sept. 19, 2008) (Strine, V.C.) (analyzing erroneous and misleading presentation by financial advisor); *Robert M. Bass Gp., Inc. v. Evans*, 552 A.2d 1227, 1245 (Del. Ch. 1988) (critiquing banker's analyses that included "at least one assumption that is incorrect, and upon others that are highly questionable"); *see also In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 817 (Del. Ch. 2011) (enjoining transaction where banker "secretly and selfishly manipulated the sale process to engineer a transaction that would permit [the bank] to obtain lucrative buy-side financing fees").

realize after selling approximately half of its business in 2012. He also cancelled a recently adopted stock repurchase program for pretextual reasons. These actions primed the market for the freeze-out by driving down Dole's stock price and undermining its validity as a measure of value. Then, after Murdock made his proposal, Carter provided the Committee with lowball management projections. The next day, in a secret meeting that violated the procedures established by the Committee, Carter gave Murdock's advisors and financing banks more positive and accurate data. To their credit, the Committee and Lazard recognized that Carter's projections were unreliable and engaged in Herculean efforts to overcome the informational deficit, but they could not do so fully. Critically for purposes of the outcome of this litigation, the Committee never obtained accurate information about Dole's ability to improve its income by cutting costs and acquiring farms.

By taking these actions, Murdock and Carter deprived the Committee of the ability to negotiate on a fully informed basis and potentially say no to the Merger. Murdock and Carter likewise deprived the stockholders of their ability to consider the Merger on a fully informed basis and potentially vote it down. Murdock and Carter's conduct throughout the Committee process, as well as their credibility problems at trial, demonstrated that their actions were not innocent or inadvertent, but rather intentional and in bad faith.

Under these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty. This decision holds Murdock and Carter

3

jointly and severally liable for damages of $148,190,590.18, representing an incremental value of $2.74 per share. Although facially large, the award is conservative relative to what the evidence could support.

The other defendants are not liable. Defendant David A. DeLorenzo erred by siding with Murdock at the outset of the Committee process, but he did not participate in the breaches of duty that led to liability. The plaintiffs also sought to impose secondary liability on Murdock's financial advisor and lead financing source, defendants Deutsche Bank Securities, Inc. and Deutsche Bank AG (jointly "Deutsche Bank"). Deutsche Bank acted improperly by favoring Murdock and treating him as the bank's real client in transactions before the Merger, even when Deutsche Bank was officially representing Dole, but Deutsche Bank did not participate knowingly in the breaches that led to liability, and Deutsche Bank's role as Murdock's advisor did not lead causally to damages.

In addition to the plenary litigation, holders of 17,287,784 shares sought appraisal. This decision likely renders the appraisal proceeding moot. The parties will confer on this issue and inform the court of their views.

## I.     FACTUAL BACKGROUND

Trial took place over nine days. The parties introduced over 1,800 exhibits. Ten fact witnesses and three experts testified live. The parties lodged twenty-nine depositions. The laudably thorough pre-trial order contained 419 paragraphs, and the pre-trial and post-trial briefs collectively totaled 668 pages.

4

The voluminous evidence conflicted on many issues. To facilitate fact-finding under conditions of uncertainty, courts evaluate evidence against a burden of proof. For this case, the appropriate standard of proof was straightforward: a preponderance of the evidence.[3] The question of who bore it was complex.

For the breach of fiduciary duty claim, the defendants initially bore the burden of proof under the entire fairness standard of review. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012). The Delaware Supreme Court held in *Americas Mining* that if defendants believe the allocation should be different, they must seek and obtain a pretrial determination in their favor. *Id.* at 1243. Otherwise, "the burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction." *Id.* The defendants moved for summary judgment on the standard of review and allocation of burden, arguing that because they emulated *MFW*, the business judgment rule became the operative standard of review. Alternatively, they argued that if entire fairness continued to apply, the burden had shifted to the plaintiffs to

---

[3] *See Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard."), *aff'd*, 991 A.2d 1153 (Del. 2010). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs, Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (Strine, V.C.) (internal quotation marks omitted). "Under this standard, [the party bearing the burden] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [the party] must prove only that it is more likely than not that it is entitled to relief." *Triton Const. Co. v. E. Shore Elec. Servs.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

prove unfairness. *See Emerald P'rs v. Berlin (Emerald II)*, 787 A.2d 85, 98-99 (Del. 2001). I held that the defendants had not made the showing necessary to change the standard of review or shift the burden, and so "the burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction." Dkt. 585 at 4, 6.

The burden for the aiding and abetting claim differed: it rested with the plaintiffs. *In re Rural Metro Corp.*, 88 A.3d 54, 85 (Del. Ch. 2014) (appeal pending). The burden for the appraisal proceeding was different still: each side bore the burden of proving its contentions. *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 221 (Del. 2005).

Although I have tried to adhere to the different burdens required by the case law, the Delaware Supreme Court has explained that the real-world benefit of burden-shifting is "modest" and only outcome-determinative in the "very few cases" where the "evidence is in equipoise." *Ams. Mining*, 51 A.3d at 1242. This was not one of those cases. Had the burden been allocated to the plaintiffs on all issues, the result would have been the same.[4]

### A.    Murdock's Relationship With Dole

Dole is one of the world's largest producers and marketers of fresh fruit and vegetables. Murdock became involved with Dole in 1985 when Flexi-Van Corporation

---

[4] The allocations did influence my rulings on a number of procedural issues, including the allotment of trial time, the order of witnesses, the schedule for post-trial briefing, and presentation of post-trial argument. Generally speaking, because the defendants bore the burden of proof on the fiduciary duty claim, they were given the advantages that ordinarily inure to the party that bears the burden, such as the opportunity to present their case and arguments first and to present a rebuttal case and reply.

6

merged with Castle & Cooke, which had owned all of Dole's stock since 1961. Both were public companies. Before the merger, Murdock was the CEO and 33% owner of Flexi-Van. After the merger, Murdock became Chairman and CEO of the combined company, which was named Castle & Cooke. Flexi-Van's stockholders received 45% of the combined company, giving Murdock a 14% stake. In 1991, the combined company changed its name to Dole.

In 2003, Murdock took Dole private in a leveraged buyout. While owned solely by Murdock, Dole felt the effects of the financial crisis of 2008. Dole had taken on significant debt, and a large tranche of bonds was scheduled to mature in 2009. Dole typically refinanced its debt a year before maturity, but it delayed in the hope that rates would improve. Instead, the bond markets froze. Dole finally refinanced its debt just sixty days before the bonds matured. It was forced to pay a very high interest rate.

Murdock's real estate ventures also suffered. Murdock had obtained loans that required unanimous approval from all of the banks in the lending syndicate to waive a covenant or extend a maturity date. During the financial crisis, several loans went into default. Some of the more troubled banks refused to modify the loans. Murdock had provided personal guarantees and faced the threat of collection actions.

Deutsche Bank and Wells Fargo stepped in to help Murdock. They had worked with Murdock for years and took a "long term view [of] the relationship." JX 1680 at 2. They bought out the objecting banks and granted the loan modifications Murdock sought. The plaintiffs accurately observe that this instance reflects the longevity and depth of Murdock's relationship with his favored banks, such as Deutsche Bank. *See* Murdock 74-

7

76 (describing his relationships with banks and noting that "most of my banks have been with me for 40 years").

To pay down the debt on the Company and his real estate ventures, Murdock considered selling Dole. Late in 2009, Dole approached Del Monte Packaged Foods Company. The negotiations stalled with Del Monte offering $700 million and Murdock asking $1 billion.

Instead of selling Dole entirely, Murdock decided to sell a portion of Dole's equity to the public. In October 2009, Dole conducted an initial public offering of approximately 41% of its shares. The IPO price was $12.50 per share, which valued Dole at approximately 5.9x estimated 2010 EBITDA.[5]

Murdock retained sole ownership of Castle & Cooke, which was spun off before the IPO. Castle & Cooke owned Murdock's other business ventures and real estate assets, including the Hawaiian island of Lanai. Murdock became CEO of Castle & Cooke. Scott Griswold, who had previously managed the Castle & Cooke businesses as part of Dole, became Castle & Cooke's Executive Vice President of Operations. Griswold was deeply

---

[5] Murdock obtained additional liquidity by entering into a forward sale covering another 27% of Dole's stock. The forward sale was structured through the Murdock Automatic Common Exchange Security Trust, and the resulting securities were called "MACES." The plaintiffs have argued that the MACES influenced the timing of the announcement of the ITOCHU Transaction, discussed below, and that communications surrounding the MACES show that Deutsche Bank's primary loyalty was to Murdock, not Dole. It is undisputed that the ITOCHU Transaction was favorable for Dole and its stockholders, and the timing of that transaction does not have any relevance to the outcome of this litigation. That Deutsche Bank saw Murdock as its primary client is apparent from overwhelming evidence in the record. The communications surrounding the MACES are cumulative.

8

involved in the process leading to the Merger. When considering his involvement, it is important to recall that he was not a Dole officer or employee during the relevant period. Griswold worked for Murdock in his capacities as the owner of Castle & Cooke and as a stockholder of Dole.

The newly public Dole operated three business segments: Fresh Fruit, Fresh Vegetables, and Packaged Foods. Fresh Fruit was Dole's largest division, with revenue of $4.4 billion in 2012. Fresh Vegetables and Packaged Foods were significantly smaller, with revenue of $1.1 billion and $1.3 billion respectively. Fresh Fruit focused primarily on bananas and pineapples with smaller operations for other products, like kiwifruit. Fresh Vegetables distributed a wide variety of fresh produce. It also included Dole's fresh berry business (despite the division's name) and distributed packaged salads and other packaged vegetables. Packaged Foods produced products such as canned pineapples, fruits cups, and frozen fruit.

## B.    Murdock's Goal Of Taking Dole Private

After Dole became public, Murdock regularly considered the possibility of taking it private again. As Murdock testified at trial, he had "never really wanted" to sell equity to the public, but "it was a necessity" because of the financial issues he faced. Murdock 98; *see id.* at 87, 89, 94-95; JX 1680. Others at Dole recognized that Murdock did not like the public company model. Sherry Lansing, an outside director and member of the Committee, testified that Murdock "seemed frustrated all the time.  He seemed frustrated with boards . . . .  He seemed not to like the push back" or the need to "have [outside directors] there . . . ." Lansing Dep. 15.

9

Murdock evidenced his distaste for the public company model in how he ran Dole. Murdock was an old-school, my-way-or-the-highway controller, fixated on his authority and the power and privileges that came with it. Murdock testified that he was "the boss" at Dole, and "[t]he boss does what he wants to do."[6] In contemporaneous documents, his

---

[6] Murdock 49-51 (video testimony); *see* Murdock 40 (admitting that he can be "pushy"); Murdock 47 ("I'm abrupt. I'm always a strong-willed man. That's the reason why I get so many things done." (video testimony)); Murdock 76 ("I have been charged many times with being a strong individual, and I'm not ashamed of it."); Murdock Dep. 175 (referring to his outside directors, "They have their own opinions too, but I'm usually a little stronger than most people.").

Murdock tried out three different personas during his testimony. During his deposition, he showed the true force of his domineering personality. During the first day of trial, Murdock tried to appear more reasonable and conciliatory on direct, but on cross-examination, he could not resist being combative. He denied basic points and made long speeches. Both during his deposition and on the first day of trial, many of Murdock's assertions were not credible or plainly wrong. To rehabilitate him, the defendants tried to portray him as a confused 91-year-old man, but it was clear that Murdock's intellect remains sharp. Murdock's problem was different. By dint of his prodigious wealth and power, he has grown accustomed to deference and fallen into the habit of characterizing events however he wants. That habit serves a witness poorly when he faces a skilled cross-examiner who has contrary documents and testimony at his disposal.

On the second day of trial, Murdock tried a different approach: He became evasive and attempted to cast himself as an uninvolved CEO who lacked any meaningful knowledge about what was going on at his company. He even denied being involved in major decisions, such as when Dole started giving intra-quarter earnings guidance in the months before the Merger. *See* Murdock 304-05, 311-14. This version of Murdock was not credible either.

In addition to offering the "confused old man" theory, the defendants sought to blunt the cumulative effect of Murdock's testimony, demeanor, and actions by citing his philanthropy, which is commendable. But it does not inoculate his business dealings. Tycoons like Vanderbilt, Carnegie, and Rockefeller built great fortunes as aggressive businessmen, then devoted substantial portions of their wealth to the betterment of all. More recently, Bill Gates led a company that was prosecuted successfully for antitrust violations, yet his foundation appears (at least to me) to be a force for good. The ultimate

associates did not address him by name. They referred to him deferentially as "the Chairman." Criticizing Murdock was unthinkable. On those rare occasions in the record when Murdock was challenged, he responded aggressively, including by giving tongue-lashings to outside directors Andrew J. Conrad and Dennis Weinberg, then forcing Weinberg off the Board. Murdock's bankers were careful not to offend him, knowing that he would put them in the "penalty box."[7]

The fact that Murdock preferred to see Dole become a private company did not mean that he was unwilling to consider other transactions that would enhance his personal wealth. He is, after all, a highly successful capitalist. One example was late 2010, when Dole contacted Chiquita Brands International Inc. about a potential merger. Importantly, the Chiquita transaction would have expanded Murdock's empire. In substance, Dole would have acquired Chiquita, with Dole's stockholders owning 63.5% of the combined company, Dole designating a proportionate number of the initial board seats, and the company operating out of Dole's headquarters. The companies came close to finalizing a deal that would have valued Dole at $1.256 billion, but Dole ultimately

---

balancing is for posterity and the divine. My task is far narrower: to evaluate how Murdock and his fellow fiduciaries behaved in connection with a specific transaction.

[7] Grellier Dep. at 47; *see* Grellier 2114 (describing Murdock as "extremely volatile"); *id.* at 2130 (describing Murdock as "very, very headstrong" and "not receptive to being pushed by anybody to do anything"). In one of the more telling moments at trial, plaintiffs' counsel asked Dole's coverage banker about an internal email in which he referred facetiously to Murdock, after the sale of Lanai, as being "bunkered in his office counting his money." Brook 1983. The banker quailed and quickly testified, "I was actually being very flip on that. He wasn't in his office counting his money." *Id.* His demeanor reflected serious concern about how Murdock would react to his remark.

11

decided not to go forward because of concerns about payments Chiquita had made in Colombia to a known terrorist organization.

The next year, Wells Fargo pitched Murdock on selling some or all of Dole to Hain Celestial Group ("Hain"). Murdock and DeLorenzo, who had taken the job as Dole's CEO in 2007, met with Hain. The discussions quickly shifted to Hain purchasing either Packaged Foods or a combination of Packaged Foods and Fresh Vegetables. A deal for those businesses seemed close, but Hain broke off talks in April 2012.

During the discussions with Hain, Murdock asked Dole's CFO, Joseph Tesoriero, to provide his recommendations about the strategic alternatives that Dole should pursue. Tesoriero prepared a two-page memorandum describing "value creation projects currently under consideration at Dole . . . in the ideal sequence in which they should occur." JX 162 at 1 (the "Tesoriero Memo"). As the memo reflected, these were not hypotheticals; they were projects "currently under consideration." *Id.* Tesoriero sent the document to Murdock and copied DeLorenzo and Griswold.

The Tesoriero Memo contemplated a three-phase plan. First, Dole would complete four small transactions then underway. As it happened, two of the deals were completed, and two were not.

Next, Dole would sell Packaged Foods and Fresh Vegetables to Hain, which was the transaction under consideration at the time. After that deal fell through, Dole explored other alternatives for Packaged Foods. As events turned out, Dole sold Packaged Foods and the Asian operations of Fresh Fruit to ITOCHU Corporation of Japan ("ITOCHU").

12

Finally, Murdock would "take [the remaining Dole] business private or . . . merge it with another company." *Id*. Tesoriero explained that although the remaining business "contains valuable assets (e.g. the Hawaii land, idle land in Latin America, our fleet of ships . . . ), it may not demand a very high multiple in the stock market due to the nature of the fresh fruit business." *Id*.

The Tesoriero Memo was a candid assessment of Murdock's overall strategy. It shows that Murdock's goal was to take Dole private again, and that Murdock and his team saw some form of break-up as a key step in the process. The basic premise was to separate Dole's higher-margin businesses (predominantly Packaged Foods) from its lower margin businesses (predominantly Fresh Fruit), realize the value of the higher-margin businesses, and then pursue a transaction involving the remainder of the Company. Although Murdock was open to other ideas for the remainder, the primary option was for Murdock to buy it.

## C. Exploring Alternatives For Packaged Foods

When the Tesoriero Memo was written, the near-term alternative for generating value from Packaged Foods was a sale to Hain. After negotiations with Hain broke down, Murdock and Dole management began considering other options. One obvious way to separate the businesses was by spinning off Packaged Foods.

Murdock focused on a spinoff after reaching an agreement on April 8, 2012, to sell Lanai for $300 million. This transaction was part of Murdock's effort to generate liquidity and reduce his overall debt, thereby strengthening his personal balance sheet for a potential take-private.

13

Murdock had owned Lanai through Castle & Cooke, and Griswold was heavily involved in the sale process. Deutsche Bank served as Castle & Cooke's advisor on the sale. With the agreement in hand, Murdock told Griswold that he wanted to focus on splitting Dole into two companies.

During the same period, Deutsche Bank began modeling a transaction in which Dole would spin off Packaged Foods and then Murdock would take the remaining company private. Eric Brook, the Deutsche Bank coverage officer for Dole, instructed his team to model "[a] separation of the Packaged Foods business . . . with the idea being that the Fruit/vegetable business would be a privateco . . . . The Consumer team will begin the go private analysis." JX 173 at 1. The overall structure resembled the plan in the Tesoriero Memo, but with the separation of Packaged Foods accomplished via a spinoff rather than a sale to Hain.

Deutsche Bank presented the spinoff-plus-take-private idea to Murdock on April 27, 2012. After the meeting, Brook instructed the Deutsche Bank team to work on two separate projects: a split-off and a refinancing for Dole and a freeze-out for Murdock. JX 179 at 1. Brook stressed that the latter was "not to share with Dole mgmt." *Id.*

At the time, Wells Fargo was already working with the Board on a spinoff of Packaged Foods. There were two main differences between Wells Fargo's plan and Deutsche Bank's. First, Wells Fargo planned a domestic IPO of Packaged Foods, while Deutsche Bank had convinced Murdock of the benefits of an Asian IPO. Second, Deutsche Bank was working on a follow-on take-private.

14

With Murdock on board, Deutsche Bank quickly asserted itself. On April 30, 2012, Deutsche Bank gave Dole management the presentation on the "Asian split-off and a refinancing" that Brook had contemplated. JX 183. On May 1, the Deutsche Bank team met again with Murdock. On May 2, the Board was scheduled to consider Wells Fargo's plan for the spinoff. So advanced was the transaction that the Wells Fargo presentation contemplated announcing it *the next day*. But after Deutsche Bank's meetings with Murdock and Dole management, the Board decided to conduct a broader strategic business review. Dole retained both Wells Fargo and Deutsche Bank as advisors. Wells Fargo considered primarily U.S.-based transactions. Deutsche Bank explored opportunities in Asia.

On May 3, 2012, Dole announced the strategic business review. The defendants tried to spin this announcement as if Dole was exploring strategic alternatives for the whole Company, but Dole's announcement was narrower: Dole said it was reviewing alternatives and evaluating prospects and options "pertaining to select businesses of the company." JX 197. The announcement highlighted the possibility of a "separation of one or more of our businesses," which was consistent with Wells Fargo and Deutsche Bank's earlier presentations focusing on divesting Packaged Foods. *Id*. Dole management considered and rejected a broader description. JX 196. Moreover, Murdock owned 40% of Dole's stock, and he was not a seller. Dole was looking primarily to sell Packaged Foods or other specific businesses to pay down debt. If an offer for the whole company had come in, Murdock and the Board would have considered it, but that was not the main focus of the exercise.

15

Wells Fargo contacted seventeen parties about their interest in potential transactions involving Dole's businesses. Ten executed nondisclosure agreements and received confidential information. None proposed a transaction. Apollo Global Management LLC ("Apollo") did contact Dole and expressed interest in purchasing Fresh Vegetables for $300 million. DeLorenzo told Apollo to offer at least $500 million. After receiving some due diligence, Apollo said it would raise its price, but would not commit to $500 million.

Meanwhile, Dole and Deutsche Bank reached out to ITOCHU, a company that had worked with Dole in Asia for over fifty years. ITOCHU had been Dole's importer of record in Japan, distributed many of Dole's products, and provided back-office services for Dole in the region. Dole and Deutsche Bank thought ITOCHU could serve as a cornerstone investor for an Asian IPO. ITOCHU was interested, and discussions began.

In May 2012, the prospect of an Asian IPO became less attractive after a selloff in the Asian markets. Murdock suggested that Dole and ITOCHU instead form a joint venture that would own the Asian operations of Fresh Fruit and Packaged Foods ("Dole Asia"). Negotiations shifted to that idea.

On June 14, 2012, Deutsche Bank provided Dole management with a presentation that analyzed both Apollo's offer for Fresh Vegetables and the potential ITOCHU joint venture. Deutsche Bank calculated that if Dole continued to trade at 6.1x EBITDA, then selling Fresh Vegetables for $500 million would increase Dole's stock price by 8.5%. JX 233 at 16. In contrast, selling half of the Asian joint venture to ITOCHU would increase Dole's stock price by 35.9%. *Id*. at 17.

16

After the meeting, Dole broke off discussions with Apollo to focus on the ITOCHU joint venture. The transactions were not mutually exclusive, but DeLorenzo thought continuing discussions with Apollo would be "too much of a distraction." DeLorenzo Dep. 21. The plaintiffs have questioned that decision, claiming weakly that it was intended to help Murdock with his eventual buyout. Having considered the record, I do not see anything problematic about the decision to focus on the joint venture.

**D.      Murdock And Deutsche Bank Continue Their Freeze-Out Discussions.**

During the strategic business review, Deutsche Bank acted as Dole's financial advisor and reported to the Board. While serving in that role, Deutsche Bank should not have been secretly helping Murdock plan to acquire Dole. But Deutsche Bank characterized itself as having a number of different relationships with Murdock and his companies. Deutsche Bank used these alternative relationships as conduits for conversations with Murdock that it should not have been having as the Board's advisor.

Deutsche Bank's roles included advisor and lender to Castle & Cooke and Murdock personally. Those roles provided the context for Deutsche Bank's meetings with Murdock about a going-private transaction in early 2012. Deutsche Bank had two separate coverage officers: Brook for Dole, and Richard Grellier for Castle & Cook and Murdock. To maintain a façade of separation, Grellier took the lead during the early 2012 discussions with Murdock. Internally, Brook and Grellier kept each other informed and planned together.

Other Deutsche Bank roles included purchasing agent for Murdock's trades in Dole stock and margin lender to Murdock. In July, Murdock and Deutsche Bank used

these roles as cover for further discussions about a going-private transaction.  An internal

Deutsche Bank presentation described Murdock's plans:

> Murdock has requested that [Deutsche Bank] consider providing debt capital alongside his capital to
>
> - 1) cash settle the remaining 24 [million] shares subject to forward sale [under the terms of the MACES issued at the time of the IPO]
>
> - 2) acquire some or all of the 15 [million] shares held by the top 15 shareholders in Dole
>
> - 3) depending on availability, acquire 90% or all of the shares of Dole.

JX 260 at 9. The presentation went on to discuss financing for an acquisition of "100% of

the shares of Dole." *Id.* The presentation cited indications that Murdock was serious,

including:

- Murdock was receptive to guaranteeing the debt.

- Murdock was willing to secure the debt using the $770 million in equity value of his holdings outside Dole.

- Murdock had told Deutsche Bank that "he will continue to sell real estate assets that were previously considered lifetime hold assets" to fund the purchase of additional Dole stock.

- In June 2012, Murdock had sold Madison Warehouse for $226 million and Castle & Cooke Cold Storage for $225 million, in addition to his earlier sale of the island of Lanai. Murdock had told Deutsche Bank that he was "committed to contribute another $90 million of proceeds" from those sales "to increase his share position."

*Id.* at 8-9, 14. The internal Deutsche Bank presentation was consistent with the overall

picture that emerges from the Tesoriero Memo, Murdock's prior discussions with

18

Deutsche Bank, and Murdock's conduct, including his sales of assets like Lanai. Murdock was pursuing a long-term strategy directed towards taking Dole private.

## E.     The ITOCHU Transaction

In late summer 2012, Dole's discussions with ITOCHU shifted to the possibility of ITOCHU acquiring Dole Asia (the "ITOCHU Transaction"). Both sides liked the idea, and discussions unfolded during August. On September 17, 2012, ITOCHU formally agreed to acquire Dole Asia for $1.685 billion in cash. Dole announced the agreement the same day. The price of Dole stock increased to over $14.00 per share.

Shortly after the ITOCHU Transaction was announced, Grellier and Murdock scheduled another meeting to discuss a freeze-out. Before the meeting, Brook spoke with DeLorenzo, who thought it was "best to find a way to get [M]urdock out of the [D]ole stock." JX 330 at 1. He recommended that Deutsche Bank present options that included an "equity market selldown," "sell[ing] [Murdock's] stake to [a] [private equity] or strategic [buyer]," and a cash sale to Chiquita, as well as a "full take private." *Id.*; *see* JX 325. But when Grellier met with Murdock the next day, Murdock volunteered that he wanted to take Dole private himself. Grellier 2123. Afterwards, Grellier told his team that Murdock was "anxious to do a deal" and "[e]specially interested in whether to aggregate assets and do transformational deals before or after a potential take private." JX 326 at 1.

On January 11, 2013, Deutsche Bank sent a presentation about a freeze-out to Dole's Treasurer, Beth Potillo. Deutsche Bank asked that she review it and "let us know if you catch anything awry." JX 394 at 1. The presentation evaluated a freeze-out funded

19

in part by rolling over Murdock's existing equity and an additional equity contribution of either $100 million or $250 million. *Id.* at 4-7.

The sending of the freeze-out presentation to Potillo illustrated how difficult it was for Deutsche Bank to maintain the fiction that it could differentiate between its roles. In this instance, while working for Dole and reporting to its Board, Deutsche Bank sent a presentation about Murdock's acquisition bid to a Dole officer and asked the Dole officer for comment. No one passed the information on to the Board.

At trial, Deutsche Bank claimed that it was no longer working for Dole when it began working on a freeze-out, but that was not accurate. Deutsche Bank began discussing a freeze-out with Murdock after the sale of Lanai. The spinoff and freeze-out were part of a two-step plan in which Murdock would take Dole private in the second step, although the second part of the strategy was "not to share with Dole mgmt." JX 179 at 1. Deutsche Bank continued its consideration of a take-private during the strategic business review, as shown by the July presentation about Murdock's stock ownership. *See* JX 260. Moreover, the signing of the agreement for the ITOCHU Transaction did not mean that Deutsche Bank's engagement ended. The firm's retention letter specified that its engagement did not end until that transaction closed, and that event did not occur until April 1, 2013. During this post-signing, pre-closing period, Deutsche Bank continued working on the ITOCHU Transaction, including by fielding calls from third parties and assisting Dole with regulatory approvals. During that period, Deutsche Bank continued helping Murdock plan a freeze-out.

**F.** **Carter Takes Over.**

As part of the ITOCHU Transaction, DeLorenzo committed to leave Dole, join ITOCHU, and run Dole Asia for at least two years. JX 371 at 9. In anticipation of DeLorenzo's resignation, the Board agreed that Murdock would start functioning as CEO, and Carter would start functioning as President and COO. Both formally assumed their roles in February 2013, after DeLorenzo resigned. The transition effectively took place in December 2012. Carter retained his position as Dole's General Counsel and Corporate Secretary. He also joined the Board. So did a former Dole director, Rolland Dickson. Dickson served on the Committee, and his background is discussed in connection with that role.

As a practical matter, responsibility for day-to-day management of Dole passed from DeLorenzo to Carter in December 2012. Carter was Murdock's only direct report, which meant that the executive team reported to him. *See* JX 699 at 2. His job was to carry out Murdock's plans, and he did so effectively, even ruthlessly. When Carter set a goal for a division, they fell into line. *See* Carter 869. Dole's executives could not envision anyone failing to carry out Carter's instructions. *See* Mitchell Dep. 56.

With the ITOCHU Transaction wrapping up, a freeze-out was the next step in the long-term plan Murdock had been pursuing. Dole had split off its higher-margin businesses, achieved a premium valuation, and used the proceeds to pay down debt. This created an opportunity to take the remaining business private.

The defendants have contended that Murdock did not decide to pursue a freeze-out until June 7, 2013, and did not make any preparations for the transaction before May

21

2013. That characterization is not accurate. Murdock had been focusing on a freeze-out since 2012, as demonstrated by the Tesoriero Memo, his regular discussions with Deutsche Bank, and his preparatory sales of assets. Once Carter took the reins, he began priming Dole for the final step.

### 1.     Carter Guides The Market Downward.

Dole management knew that after the ITOCHU Transaction, Dole could achieve significant cost savings. Dole had sold approximately half of its business and could "right-size" the rest. *See* JX 1147 at 6. In its fairness presentation to the Board, Deutsche Bank advised that Dole could achieve $50 million in annual cost savings. Deutsche Bank viewed the $50 million per year estimate as reasonable, had undertaken "due diligence discussions around it," evaluated "what triggered the cost savings," and "stress-tested" the estimate to "understand what the sources of those cost savings were to confirm that those made sense in the context of the separation of Dole Asia." DiMondi 1464-66. In a presentation to analysts, DeLorenzo provided the same $50 million figure, explaining that $20 million of savings would be implemented immediately at the corporate level and the remaining $30 million would be implemented at the division level, with the full run-rate of $50 million per year achieved by the end of 2013. These estimates were arguably conservative. An April 2012 analysis by Dole management estimated annual total cost savings as high as $125 million. JX 1615 at 3. And in January 2013, Deloitte & Touche had sent Carter an analysis identifying savings of $50-90 million per year. JX 389 at 4.

In November 2012, Dole reiterated that it expected to achieve the full $50 million in annual savings, with $20-25 million achieved in 2013 and the full $50 million per year

22

starting in 2014. JX 350 at 11. A Board presentation in December 2012 projected similar figures, although with a one-year delay before they would be fully achieved. According to that presentation, $35 million in savings would be achieved in 2014 and the full $50 million achieved in 2015. JX 370 at 8.

Then in January 2013, Carter announced something different. In a January 2 press release, he told the markets that Dole's "current expectation" was for adjusted 2013 EBITDA in the $150-$170 million range, "including 2013 planned cost savings in the $20 million range." JX 384. He did not mention any additional cost savings. Dole's stock price dropped 13% after the announcement. JX 987 at 5.

Three weeks later, Dole issued another press release. It quoted Carter as saying, "[W]e expect 2013 Adjusted EBITDA for the new Dole to be at the low end of the guidance range we announced on January 2, 2013, assuming no major market changes." JX 400 at 3. The January 24 release also lowered Dole's valuation of certain assets, including 25,000 acres of land in Hawaii, which was revised down to $175-$200 million from over $500 million just four months prior. *Id.* at 4; JX 1138 17. And, on February 22, 2013, Carter announced that "[f]resh fruit performance is continuing its declining trend, principally due to banana market conditions, and Dole expects that 2013 Adjusted EBITDA for these businesses will be at the low end of the previously announced guidance range of $150 - $170 million . . . ." JX 426 at 3.

The defendants have claimed that Carter made these announcements because he honestly believed that Dole would not hit its guidance and that $30 million of the $50 million in savings was not achievable. The $50 million in savings that DeLorenzo

23

announced, however, was actually lower than Dole's internal plan, which identified $62 million in specific cost-cutting initiatives. JX 3069 at 2. As support for the supposed impossibility of achieving the cuts, Carter argued that "one of the ideas was to smash together, merge if you wish, our Vegetables business with our North America Fresh Fruit business" and that such a move "just could not work in the market in terms of the people we sold to." Carter 1105. That portion of the cost-saving plan accounted for only $10-$20 million in cost savings, leaving $42-52 million in other initiatives. JX 389 at 13. The defendants never went over the detailed spreadsheet of department-by-department savings that DeLorenzo prepared. They simply relied on Carter's testimony, without offering any quantification or support. *See* Carter 872, 1105, 1137.

Just as the defendants did not explain where the cost savings went at trial, Carter did not explain the disappearance of the cost savings to the market. The loss of $30 million in savings represented approximately 20% of Dole's forecasted EBITDA, yet he mentioned it virtually without comment. The timing of his announcement on January 2 suggests the real reason. It came just after Deutsche Bank renewed its discussion with Murdock about the freeze-out and just days before Deutsche Bank gave a detailed presentation that it prepared with the assistance of Dole management on January 11. *See* JX 326, 394. In other words, Carter made the announcement just as internal discussions about the freeze-out were heating up.[8]

---

[8] Equally telling was the fact that promptly after the Merger had been negotiated, Murdock told his lenders that Dole could achieve $200 million in EBITDA. Carter testified that Murdock made that claim without any support, and that he was forced to fill

## 2. The Brouhaha Over The Self-Tender

A week after the January 2, 2013, release that guided the market downward, Murdock, Carter, and Potillo met with Deutsche Bank, ostensibly about a potential share repurchase program for Dole. Deutsche Bank's presentation did discuss Dole repurchasing $25-$200 million of its shares, but also contained a section on a potential purchase of 100% of the Company's outstanding stock—a full take-private. JX 392. On January 25, 2013, Deutsche Bank sent Griswold and Potillo another presentation and discussed in the cover email how the different programs would affect Murdock's ownership and his ability to gain majority control. JX 404 at 1. A presentation prepared by Scotiabank, another Dole lender, explained how the repurchase program would fit into plans for Murdock to take Dole private. JX 447 at 6. Scotiabank projected that the repurchase price would be significantly lower than what Murdock would pay for the remaining shares, meaning Murdock would benefit more from a larger repurchase.

In February 2013, Deutsche Bank provided Dole management with another presentation, this time analyzing the choice between a self-tender and a program of open market purchases. JX 415 at 6-7. The presentation explained that a self-tender would enable Dole to buy a larger volume of shares quickly, but that Dole would have to pay a

in the gap with cost savings. Carter 970-71. Fortunately, Carter was able immediately to identify $40 million in cost savings, $35 million of which were unrelated to the elimination of public company costs. Carter 971, 979. In reality, the cost savings that Carter found were the same savings that were previously available. During his deposition, Renato Acuña, the President of the Fresh Fruit division, testified candidly that the cost savings achieved after the Merger were available previously. *See* Acuña Dep. 14-15. Carter simply delayed them so that post-Merger, Murdock would benefit.

premium over market. With the open market program, Dole would not a pay a premium, but there was a "risk of price appreciation given the long time frame." *Id*. at 7. Describing the price appreciation as a "risk" showed where Deutsche Bank's loyalties lay. Price appreciation was a risk to Murdock for taking the company private. It was not a risk for Dole or its stockholders, who would benefit from the higher price.

Murdock and management decided that that they favored the self-tender. Dole hired Bank of America Merrill Lynch ("BAML"), another bank that Dole had worked with frequently in the past, to advise on the share repurchase. At Deutsche Bank, Grellier and Brook decided they were "comfortable" with this development because they thought it was "[b]etter to hold out for [the] advisory" engagement on the freeze-out transaction. JX 474 at 1. They just needed to "[make] sure [the BAML bankers] don't get too close to go private discussions." *Id.*

On May 2, 2013, the Board discussed the potential share repurchase program. At the time, the Board had nine members. Three were members of management: Murdock, Carter, and DeLorenzo. A fourth was Murdock's son Justin. The other five were outside directors: Conrad, Weinberg, Lansing, Dickson, and Elaine Chao. The four outside directors other than Weinberg would later serve on the Committee, and this decision discusses their backgrounds in connection with that event.

Conrad and Weinberg opposed the self-tender. They believed that open market purchases were better for Dole and its stockholders. Due to their opposition, the Board decided to revisit the issue in three to five days. Weinberg made plans for the outside directors to have an executive session with counsel in the interim.

Meanwhile, the bankers at BAML were becoming concerned. They advised Carter and Potillo to buy shares in the open market or wait for the stock price to decline. JX 510 at 1. Internally, the bankers described the self-tender as "ridiculous and terrible corporate finance" to the point where "[r]eputational risk of such is [a] real issue . . . ." JX 511 at 1.

But Murdock kept pressing for a self-tender, and he called Conrad and Weinberg repeatedly about it. Eventually, Conrad told Murdock bluntly that he thought Murdock was trying to get a majority of the shares and that Conrad would not let him do it through a self-tender. Murdock became furious. Conrad 831. On May 4, 2013, he left Conrad the following voicemail:

> Hello, Dr. Conrad. David [Murdock]. I'd like to talk to you. I'm in New York at [telephone number]. I wanted to talk with you about what's going on [with] you and Denny Weinberg. I can't believe that you are opposed to the most, very good thing for the company, and I cannot imagine why you would be opposing it, but it sure as hell pisses me off to think that you didn't call me and tell me what it is going on with you. I'm not accustomed to having a friend double-cross me but if that has happened . . . .

JX 518. Murdock continued speaking, but Conrad's voicemail stopped recording. At trial, Murdock testified that he ended his threatening message with the suddenly conciliatory conclusion, then "I'll go your way." Murdock 415. That testimony was not credible.

On May 6, 2013, the outside directors met in executive session. They discussed the self-tender and open market repurchases. They also considered possible defensive measures against Murdock, but decided not to implement any.

On May 8, 2013, the full Board met. Murdock did not attend. The directors unanimously approved open market repurchases.

27

After the vote, Murdock left a voicemail for Weinberg that was similar to the one he left for Conrad. Weinberg described the message as "not for public consumption." Weinberg Dep. 33. Conrad described it as "stronger than mine." Conrad Dep. 13. Weinberg recalled Murdock saying, "[I]f you think you're trying to take over my company, you won't be successful. Nobody needs you, including me, and we'll talk about that more when you call me." Weinberg Dep. 33; *cf.* Murdock 62-66 (providing not-credible testimony after viewing video clip of Weinberg).

Weinberg did not call Murdock back. A few days later, Carter called Weinberg and asked him to resign, citing a "lack of collegiality at the board level" due to Weinberg's "personality clash" with Murdock. Carter Dep. 20. On May 14, 2013, the Board executed written consents accepting Weinberg's resignation. Justin Murdock also resigned. This left Dole with three management directors (Murdock, Carter, and DeLorenzo) and four non-management directors (Conrad, Chao, Lansing, and Dickson).[9]

---

[9] When asked about the reason for Weinberg's departure during his deposition, Murdock initially testified that Weinberg had bought a house on Lanai, "was thinking about retiring," "was thinking of doing other things," "didn't have time," and "couldn't always be [present at Board meetings]." Murdock Dep. 41. After being confronted with his May 4 voicemail to Conrad and Weinberg's deposition testimony, Murdock conceded the true backstory of Weinberg's ouster. Murdock 42-45. Murdock nevertheless claimed that he and Weinberg "stayed—not quite as close a friends as we used to be, but friendly" and that Weinberg "was at his house and had meals." Murdock 67. Weinberg testified during his deposition in May 2014 that he had not spoken to Murdock since leaving the Board a year earlier. Weinberg Dep. 34.

### 3. Carter Cancels The Repurchase Plan.

Murdock did not get his way on the self-tender, but he and Carter made sure that the outside directors did not get their way either. Two weeks later, Carter used the pretext of funding new ships to cancel the repurchase program.

Dole shipped most of the bananas destined for North America on a fleet of three refrigerated vessels. By 2013, the ships were old and needed replacing. In May, Dole management recommended commissioning three new ships for $168 million. Management explained the old ships had to be retired, and Dole would either need to buy new ships or pay expensive third-party shipping costs. Management estimated that new ships would save $37 million per year compared to third-party shipping costs.

The Board approved the new ships, and Carter issued a press release announcing the decision on May 28, 2013. In the same press release, he announced that share repurchases had been "suspended indefinitely." JX 582. The press release quoted Carter as stating:

> [W]e have decided to use our existing funding resources to take advantage of this opportune window in the shipping industry. . . . With the approximate $165 million investment in the ships and the drag on earnings due to significant losses in our strawberry business, the share repurchase program is being suspended indefinitely.

*Id.* at 1. After the announcement, Dole's stock price tumbled 10%.

Carter had not informed the Board about his decision to suspend the repurchase plan, nor had he suggested any connection between the ships and the repurchase plan. Dole's outside directors only learned of the plan's cancellation from public sources. Chao described the press coverage as "pretty devastating" and asked Carter if he had

29

anticipated the response. He had, and he testified at trial that he knew the announcement would drive down the stock price. JX 592; Carter 1101.

At trial, Carter claimed he cancelled the plan because he was worried about covenants in Dole's debt, and he performed a calculation which showed the covenants were at risk if Dole immediately spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for the ships. That calculation was pretextual. Dole was not obligated to spend the full $200 million on shares, and the program was authorized to be carried out over a year. The contract for the ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014. The Board believed that the ship acquisition and share repurchase programs were both feasible. So did BAML, which advised the Board on the share repurchase. On cross-examination Carter conceded that the debt covenants would not have been tripped by pursuing both initiatives, even if the ships had been paid in full and all $200 million of share repurchases were completed in May 2013. Carter 1097-1101. In any case, there was no reason Carter needed to take action immediately without consulting the Board.

## G.    Murdock Makes His Proposal.

While these events were unfolding, Murdock was making his final preparations for the freeze-out. During a meeting on April 12, 2013, Murdock cautioned Deutsche Bank to provide feedback "in verbal form only" and "to restrict the working group to only senior bankers," which meant the people who had "been at his breakfast table over the last 90 days." JX 476 at 1. After the meeting, Deutsche Bank updated its internal materials. JX 1681 at 1.

30

On May 15, 2013, Murdock met with senior bankers from Deutsche Bank and told them he wanted a "highly confident" letter on May 29 and would "approach the board on the 31st." JX 555 at 1. Murdock and Carter spoke with Deutsche Bank again on May 20. JX 564 at 1. They discussed "arranger fees" for Deutsche Bank to finance the take-private. *Id.*

At trial, despite all of his preparations, Murdock testified that he had not yet decided to propose the Merger. He claimed that in early June 2013, he visited his friend Lee Kun-hee, the chairman of Samsung, in South Korea, and that Lee told him to make up his mind. Murdock supposedly decided on the flight back to pursue the freeze-out.

That is a nice story, but Murdock did too much planning over the preceding months, had been considering a freeze-out for too long, and is too decisive an individual to have dithered until Lee bucked up his courage. He initially delayed because he thought the share price was trending down, in part because of Carter's activities, and a lower price would make his proposal look better. *See* JX 1689. Murdock may well have chosen not to make his proposal formally until after he returned from Korea, but that was a matter of personal convenience. It was not because he was at a loss for what to do.[10]

---

[10] Carter claimed at trial that he was shocked to receive Murdock's proposal. Carter 946. That testimony was not credible. Carter participated in meetings and conference calls concerning Murdock's take-private plans during the preceding months, and he had helped negotiate the financing fees that Deutsche Bank would earn.

## H. The Committee

On June 10, 2013, Murdock delivered his initial proposal to the Board. JX 604. The stock had most recently traded at $10.20. Murdock's letter contemplated a transaction at $12.00 per share. Murdock stated that he was "a buyer, not a seller," so the Board would not be able seek a higher price per share from a third party interested in buying the entire Company. *See* JX 610; Murdock 460-61; Conrad Dep. 9.

Murdock set a deadline of July 31, 2013, for the Board to respond to his offer. His letter stated that "time is of the essence" and that he planned to withdraw his offer if it wasn't accepted by July 31. JX 604 at 4. Murdock did not set the deadline because of any particular event that would occur after July 31. Murdock admitted at trial that he set an artificial deadline so the Board would have to act quickly. Murdock 459-60.

On June 11, 2013, the Board formed the Committee, comprising Conrad, Chao, Dickson, and Lansing. Of the four, Conrad had the most entanglements with Murdock:

- Conrad had a long history as a director for Murdock-controlled companies. He served as a director of Castle & Cooke from 2005 to 2009, and as a director of Castle & Cooke Investments from 2008 to 2009. At the time of the Merger, he had served as a director of Dole since 2003 and also served as a director of NovaRx Corporation, another company that Murdock controlled.

- In addition to serving as a director of NovaRx, Conrad served as a clinical design consultant for NovaRx and invested $2 million in Prescient Innovations I, LLC, the affiliate through which Murdock controls NovaRx.

- Conrad and Murdock co-founded the California Health & Longevity Institute, where Conrad served as the Lab Director. Conrad owned 70% of the entity, which was located across the street from Dole's headquarters in space leased from a Murdock affiliate.

- Conrad was the Chief Scientific Officer of the North Carolina Research Campus (the "NCRC"), which Murdock founded in 2005 and to which Murdock gave $700

32

million. One of the NCRC's programs is the David H. Murdock Research Institute (the "Murdock Institute"). During the time that he served on the Board, Conrad served as a director of the Murdock Institute. Since 2007, Murdock and his affiliates made contributions and extended loans to the Murdock Institute totaling $243.2 million. On May 8, 2013, shortly before he made his merger proposal, Murdock pledged an additional $50 million to the Murdock Institute.

- Conrad was the Executive Vice President and Chief Scientific Officer of LabCorp. In collaboration with Duke University, LabCorp was commercializing new biomarkers using data from the MURDOCK Study (Measure to Understand Reclassification of Disease of Cabarrus/Kannapolis), funded through a $35 million grant from Murdock.

In addition to these carrots, Murdock had shown Conrad the stick. After Conrad and Weinberg led the opposition to Murdock's self-tender proposal, Murdock left threatening voicemails for both of them, and Carter secured Weinberg's resignation.

Dickson's connections to Murdock were not as extensive as Conrad's, but also deserved a closer look. He was the Emeritus Director of Development at the Mayo Foundation for Medical Education and Research. Murdock had contributed to the Mayo Foundation to fund a professorship called the David H. Murdock-Dole Food Company Professorship, and the Mayo Clinic listed Murdock as a principal benefactor. In 2001 and earlier, Dickson served as Murdock's personal physician. From 1999 to 2003, Dickson served on the Dole Board, and he was a member of the special committee that approved Murdock's going-private transaction in 2003. After that deal closed, Dickson left the Board. Murdock reappointed Dickson to the Board in February 2013—just months before he made his proposal. One might be skeptical about the coincidence. Dickson received $98,000 for serving on the Committee in 2013, which represented approximately one-fourth of his income.

Lansing was a former actress and successful film studio executive, having served as Chair and CEO of the Motion Picture Group of Paramount Pictures from 1992 to 2005. She was also a philanthropic leader. She co-founded the California Spirit gala, which raises funds for the American Cancer Society. In 2009, the California Spirit event honored Murdock, and Lansing joined the Board later that year. Of a similar order of magnitude, Lansing had served on the Board of Regents of the University of California system since 1999 and was Chair from 2011 to 2013. She also served on the board of the UCLA Foundation, while Murdock has been a Regents' Professor of Creativity in Business at UCLA's Anderson Graduate School of Management and presented at the UCLA Longevity Center Institute Conference. Lansing also served on the American Red Cross Board of Governors, which held its All American Award Dinner in 2013 at the David H. Murdock Core Laboratory at the NCRC.

Chao had the fewest ties to Murdock. She served as a director of Dole from 1993 to 2001, then rejoined the Board in 2009. She served as Secretary of Labor in the cabinet of President George W. Bush from 2001 to 2009. Murdock raised funds for George W. Bush. She is married to Senator Mitch McConnell, and Murdock contributed $4,800 to his campaign in 2008.

Murdock, Carter, and DeLorenzo wanted the Board to pick the Committee's Chair, and they wanted it to be Conrad. The Committee members wanted to pick their own Chair, and because they comprised a majority of the Board, they were able to include this power in the resolutions. Murdock, Carter, and DeLorenzo voted against that

provision. The disagreement over who should pick the Chair turned out not to matter, because the Committee chose Conrad anyway.

Before trial, Conrad's role as Chair was not a reassuring fact. It was reasonable to infer from Conrad's ties to Murdock, the events surrounding Weinberg's resignation, and the insiders' desire to have Conrad as Chair that Conrad would be cooperative, if not malleable, when facing Murdock. But after hearing Conrad testify and interacting with him in person at trial, I am convinced that he was independent in fact.

Dickson, Lansing, and Chao did not testify at trial, but having considered the Committee's performance, I have no concerns about their independence. That is all the more true for Lansing, whose connections to Murdock suggested only that they moved in the same circles and were not themselves compromising, and for Chao, whose connections to Murdock were similar in tenor but less extensive.

## I.    Carter Interferes With The Committee.

With the Committee established, it would have been nice if Murdock and Carter had stepped aside and let the Committee do its job. They could have taken the 4-to-3 vote on choosing the Chair as an indication that the Committee would be independent. Instead, Carter asserted himself.

The first fight was over the scope of the Committee's authority. The Committee wanted its mandate to include considering alternatives to Murdock's proposal, with the additional authority to continue considering alternatives even if Murdock withdrew his proposal. Carter objected, telling the Committee:

35

> The Dole Board created the Special Committee . . . specifically to deal with Murdock's proposal and for no other purpose. That's the only delegated authority from the Board. That's why the resolutions have a termination provision, so that the Special Committee's mandate ends if the proposal is withdrawn. . . . [T]he Board did not replace itself with a charge to sell the company other than in the context of the proposal.

JX 651 at 1. As Conrad recalled, Carter "hammered on" these issues with the "intention to try to limit the scope of what the Committee could do." Conrad Dep. 20. The Committee members decided not to force the issue because they believed that if push came to shove, they comprised a majority of the Board and could have a new vote at the Board level.

The next confrontation was over the Committee's ability to enter into non-disclosure agreements with other potential bidders. Carter insisted on having control over the terms of the agreements. He stated that "Dole will not delegate its authority over its own proprietary confidential information" to the Committee, and he insisted that "Dole will enter in a direct confidentiality agreement with that party, starting from a standard form and tailoring for the specific attributes of that third party." JX 651 at 1. On this issue, Carter was clearly in the wrong, because it was the Committee that was empowered to exercise Dole's authority, not Carter. But the Committee decided not to force this issue either. As a result, Carter always knew whenever the Committee provided confidential information to an interested party. Carter nominally worked for Dole, but he really worked for Murdock, so Murdock knew as well.

The third dispute was over the Committee's choice of advisors. Conrad took the lead in the selection process, and he started by reading *MFW*. With the help of other

Committee members, Conrad compiled a list of law firms and investment banks. To ensure that their advisors would be independent, Conrad and the Committee ruled out firms that had done business with Murdock or Dole, as well as any firms that Murdock or Dole recommended. After interviewing several, they retained Sullivan & Cromwell LLP and Richards Layton & Finger, P.A. as their legal counsel, and Lazard as their financial advisor. The lead attorney from Sullivan & Cromwell was Alison Ressler. The lead partner for Lazard was Al Garner.

Carter objected to Lazard. He wanted the Committee to hire BAML, a bank with a longstanding relationship with Dole. Carter complained that Conrad had not given him a draft of Lazard's engagement letter before signing it, that a twelve-month engagement was too long, and that the letter contemplated that Lazard would explore alternative transactions. Returning to his stance on the Committee's mandate, Carter argued that "Lazard is incentivized to go well beyond Murdock's Proposal and the Board's intended scope of the Special Committee." JX 660 at 3. Carter complained to Murdock and DeLorenzo as well, explaining that "the scope of Lazard's engagement goes well beyond the Special Committee's mandate." *Id*. at 1.

In response to Carter's concerns, the Committee and Lazard removed the reference to a twelve-month engagement and the detailed description of alternative transactions. *Compare* JX 654 *with* JX 652. At trial, Conrad explained the practical reasoning behind the concession. Carter was refusing to let Lazard start conducting due diligence until he signed off on Lazard's engagement letter, and the clock was ticking on a response to Murdock's offer.

37

Meanwhile, Murdock was preparing to launch a hostile tender offer if the Committee did not respond favorably by the July 31 deadline. On June 28, Murdock told Deutsche Bank that he was 75% sure he wanted to move forward with a hostile tender offer if the Committee did not agree to a transaction, and he told Deutsche Bank to be ready to launch in three to four weeks. JX 1729 at 1. Murdock indicated that his reserve price for the tender offer was between $13.00 and $13.50 per share. *Id.* Deutsche Bank prepared an internal "hostile offer memo" describing the offer. JX 1613. A draft press release contemplated that the offer would be launched during the Committee's deliberations. It included a proposed quotation from Murdock which stated that he was making a tender offer despite "recogniz[ing] that the Dole special committee has not concluded its study of my initial proposal." JX 678 at 2. Other documents confirm that Murdock was preparing to launch a hostile offer. *See*, *e.g.,* JX 679; JX 1607; JX 1730; JX 1757. Carter knew that Murdock was preparing the hostile offer and consulted with Deutsche Bank and Murdock about it. *See* JX 1729 at 1; JX 1730 at 1; *cf.* Carter 966. At trial, Carter argued that he had no obligation to inform the Committee as long as Murdock had not yet made a firm decision to launch. Carter 1013.

## J.    Carter Gives False Financial Information To The Committee.

The next step in Carter's interactions with the Committee proved fatal to the process. To be able to negotiate at arm's length with Murdock, the Committee needed reliable financial projections from Dole management. Lazard's work, including any fairness opinion it rendered, likewise depended on "the accuracy and completeness" of "estimates and forecasts provided by the Company." JX 783 at 2. As Garner candidly

acknowledged, material misinformation from the Company could undermine the entire exercise. Garner 1311.

Carter used his control over Dole's management to provide false information to the Committee. In the ordinary course of business, on an annual basis, Dole prepared three-year budgets and financial projections using a bottom-up process. That process typically began in late summer and continued through the fall. It started with the operating divisions, which created detailed models and projections for Dole's management. Management then aggregated the projections, met with the divisions, and pushed them to refine their figures. After an iterative process, senior management generated the final numbers.

Using its standard process, under DeLorenzo's direction, Dole had prepared a set of three-year projections in December 2012 (the "December Projections"). In April 2013, Dole provided the December Projections to its lenders for use in refinancing Dole's debt after the ITOCHU Transaction.

Lazard obtained a copy of the December Projections shortly after being retained. On July 8, 2013, Lazard met with Dole management to discuss the December Projections. At the meeting, Lazard asked for updated projections that reflected Dole management's "current best views about the prospects of [the] business." Garner 1248. Lazard also asked Dole management to extend the projections from three to five years.

Carter took charge of revising the December Projections. He called together Dole's senior management, including the division heads from foreign offices, for a two-day meeting on July 9 and 10, 2013. During the meeting, Carter instructed the division

heads to create modified projections from the top down. Rather than generating a complete set of projections with supporting profit-loss statements, Carter and his team created only high-case and low-case adjusted EBITDA forecasts. Carter told the division heads to reverse engineer the supporting budgets after the meeting. That process was not completed until July 22, 2013.

On July 11, 2013, Carter presented the new five-year projections (the "July Projections") to the Board and the Committee. He did not give the Committee or its advisors the opportunity to meet in person with the division heads.

The July Projections were significantly lower than the December Projections. For example, the July Projections reduced the EBITDA in year three of the December Projections from $211.9 million to $169.2 million, a reduction of over 20%. JX 783 at 17. The July Projections were so low that Lazard did not think they would support Murdock's $12.00 offer, much less provide a basis for negotiating a higher price. Garner 1249. Conrad concluded that the projections were not "an accurate representation of the value of the Company." Conrad Dep. 25. Garner thought that "management had taken a meat cleaver to the projections in a way that it would be very difficult, if not inappropriate, for a committee to weigh these projections as the basis for determining the adequacy of a price." Garner Dep. 32.

Two aspects of the July Projections warrant particular focus. First, the projections contained only $20 million out of the $50 million in post-ITOCHU cost savings that Deutsche Bank had validated and DeLorenzo had originally predicted. Carter 881-82. This decision has already discussed the unsupported nature of that reduction.

40

Second, the July Projections did not forecast that Dole would receive any additional income from purchases of farms. Carter 985. At the time Carter prepared the July Projections, Dole management had identified the need to acquire farms as a strategic imperative. Dole sourced its fruit in Latin America from both Dole-owned farms and independent growers, and Dole had embarked on a long-term strategy of increasing the amount of fruit sourced from Dole-owned farms. Historically, Dole occupied an advantageous position as a middleman that bought from disorganized and unsophisticated growers and sold to a fragmented distribution market that lacked pricing power. But in the new millennium, both ends of the equation were changing. Consolidation in the grocery industry and the entry of large purchasers like Wal-Mart shifted the balance of pricing power towards distributors. Meanwhile, the internet gave growers access to detailed pricing information, and changes in the transportation market enabled them to bypass Dole by shipping fruit in refrigerated containers on general purpose container ships. The logical strategic response for Dole was to increase the scope of its vertical integration by acquiring farms, thereby capturing the growers' share of the profits.

Before the ITOCHU Transaction, Dole had plans to purchase additional farms in Latin America. In October 2012, the Board approved the acquisition of 2,328 hectares of banana farms in Ecuador for $58.9 million, which Dole estimated would generate $15 million per year in incremental income. JX 344 at 71. Dole expected that investing in other new farms similarly would "improve [Dole's] average fruit cost . . . and margins." JX 900 at 2.

41

Dole delayed the farm purchases because of "cash flow restrictions" before the ITOCHU Transaction. *Id*. at 2. The sale to ITOCHU gave Dole the financial resources to resume its purchases. *Id*. Dole bought approximately half of its targeted farms before the remaining purchases were suspended because of a tax dispute with Ecuadorian authorities. JX 421 at 7; Acuña 1167.

Although Dole had focused initially on Ecuador, the Company's interest in farms was not limited to that country. Dole was engaged in a "permanent search for the most efficient source mix" in Latin America and beyond. JX 900 at 2. Put simply, Dole was interested in good deals on farms wherever it could find them, and the capital request for the Ecuador farms noted that buying farms in Guatemala and Costa Rica would be advantageous for the same reasons. JX 900 at 2; DeLorenzo 641-43, 680. But the July Projections did not contain any incremental income from farms.

In contrast to what gave the Committee, Carter provided more positive information to Murdock's bankers when he met with them separately the next day. Griswold had asked Carter to set up a meeting between Dole management and the lenders for Murdock's freeze-out so that the lenders could conduct financial due diligence. Having brought Dole's management together to create the July Projections, Carter had them stay for a meeting with Murdock's bankers on July 12, 2013 (the "Lender Meeting"). Multiple representatives from Deutsche Bank, BAML, and Scotiabank attended, as did Griswold and Murdock's attorneys from Paul Hastings. At least fourteen members of Dole's senior management were present. Carter did not tell the Committee or its advisors that the meeting was taking place.

42

Carter claimed at trial that the purpose of the Lender Meeting was to update Dole's existing lenders about the Company's performance, not to talk about Murdock's take-private proposal. Carter 964. That was false, as he conceded when confronted with contrary evidence on cross-examination. Carter 1024. Griswold had asked for the meeting, and he was not a Dole employee. When instructing Dole management to stay for the meeting, Carter told them explicitly that they needed to "[p]lan to hold over to make presentations/respond to questions in a D/D [due diligence] meeting on Friday July 12 . . . [to] [a]bout 20+ people from DHM's [Murdock's] four lead banks *re the go-private proposal*." JX 681 (emphasis added). Deutsche Bank regarded the Lender Meeting as a "Project Fresh Financing Due Diligence Session," using the code name for the freeze-out ("Project Fresh"). JX 3042 at 1.

During the Lender Meeting, Carter told Murdock's bankers that Dole would outperform the July Projections. He said that Dole would "beat or meet forecasts of $155 [million in EBITDA]" and that Dole likely could "upsize the projection by $18-$19 [million]." JX 692 at 1.

During the Lender Meeting, Carter discussed the projected $50 million in post-ITOCHU Transaction cost savings. The meeting agenda included a discussion of the "timing and realization of total cost savings, originally guided at $50 m[illion] at the time of [the] announcement of [the] ITOCHU transaction." JX 3042 at 10. In preparing for the meeting, Carter did not simply stick to the lowered guidance he had given the market in January. He instead instructed Tesoriero to send him the original analysis that supported "well over $50 [million in cost savings]" on July 2. JX 1697 at 1. According to notes by a

43

Deutsche Bank representative, Carter said Dole already had achieved "just $20 [million] of cost savings" in the $154 million EBITDA for 2013. JX 692 at 3.

Carter also told Murdock's bankers during the Lender Meeting that Dole would be able to substantially increase its income by buying more farms. Notes taken by a Deutsche Bank representative reflect that Dole's farm purchases "[e]asily could be $100 [million] ($15 [million] initial return or 20% EBITDA margin)." JX 692 at 3. Dole was "[t]rying to reach a competitive advantage in Guatemala" and hence "buying its own farms for the first time." *Id.* at 2. Ecuador remained at the top of the list, but Dole "could capture a buck on pricing anywhere by buying farms." *Id.* at 3. Notes taken by a BAML representative confirm Dole's plan to "[a]cquire more land to have more Dole owned bananas and pineapples." JX 699 at 5.

The Committee and its advisors never found out about the full scope of the Lender Meeting. They did learn the next day that Deutsche Bank had met with Dole management without them, and they were informed that Deutsche Bank had access to the Committee's data room. JX 700 at 3. But until this litigation, the Committee and its advisors never knew that BAML, Scotiabank, Wells Fargo, Paul Hastings, and Griswold had also attended the Lender Meeting, or that Murdock's advisors had the opportunity to meet in person with and question Dole's international management. *Id.*; Conrad 816. By the time the Committee learned about the meeting, Dole's international management team had already dispersed throughout the world, so the Committee could not obtain equivalent information for itself. *See* Conrad 813.

The Lender Meeting was an obvious violation of the procedures that the

44

Committee had established. On June 24, 2013, Conrad had sent letters to Murdock and Carter setting forth the procedures to be followed for confidential information about Dole in connection with Murdock's proposal. JX 646 (the "Process Letter"). The Process Letter instructed Murdock and his advisors to go through the Committee when interacting with Dole on matters relating to Murdock's proposal. It stated clearly that "all communications by you or any of your advisors concerning [the proposed take-private] . . . should be strictly limited to myself, as Chairman of the Committee, or our advisors, [Sullivan & Cromwell] and Lazard." *Id*. at 2.

If the Committee had known about the planned Lender Meeting, it would not have permitted the meeting to take place. Garner 1323-24. If the Committee had authorized some form of due diligence meeting for Murdock's lenders, then Lazard and possibly the Committee members themselves would have attended. *Id.* Lazard and the Committee never learned what Carter told Murdock's lenders about the cost savings and the farms. Conrad 815-16, 819-22. As Conrad recognized, "[t]his information would have been helpful and important to us. We should have known this." Conrad 834.

The Lender Meeting was not the only time that Carter flouted the Committee's instructions. After learning that Deutsche Bank had met with Dole management, Sullivan & Cromwell instructed Carter to "immediately shut down Deutsche Bank's access to the data room and cease to provide them with any information." JX 700 at 3. *Carter refused.* When Sullivan & Cromwell responded that providing information to Deutsche Bank violated the Process Letter, Carter responded, without explanation, "I am complying with

45

the process letter." *Id.* at 1. But he wasn't, and he hadn't.[11] Carter also had violated the Process Letter and his duties to Dole by helping Murdock and Deutsche Bank to plan a hostile tender offer, and he would do so again later in the process by advising Murdock and his team about negotiating with the Committee and the terms of the eventual merger agreement.

**K.      The Committee Develops Its Own Projections.**

Once the Committee and Lazard realized that they could not rely on the July Projections, they decided to prepare their own forecasts. They used the December Projections as a starting point and made their own adjustments. The Committee instructed Lazard to attempt to replicate Dole's normal bottom-up budgeting process and to draw on other sources within Dole, such as materials used to secure financing, public statements about value, and Board presentations.

Using these inputs, Lazard prepared the "Committee Projections." *See* JX 783 at 21-22. Conrad personally spent many hours working with Lazard on the new projections. Conrad 767. The Committee and Lazard concluded that the Committee Projections

---

[11] At trial, after being pinned down on cross-examination and forced to concede the actual subject matter of the Lender Meeting, Carter characterized his decision not to tell Lazard about it as an innocent mistake, suggesting that "if I had to do it again, I would have [invited Lazard]." Carter 965. That testimony was not credible. Carter invented a cover story for the Lender Meeting at the time, and he stuck with it until it was proven false on cross-examination at trial. He never provided the Committee with full disclosure about the participants in the Lender Meeting or its subject matter even after the fact. And he continued to violate the Process Letter in other ways as the Committee's process unfolded.

represented an aggressive but reasonable and achievable forecast. Conrad Dep. 29; Garner 1258.

Notably, because Lazard relied on guidance provided by Dole management, the Committee Projections did not include upward adjustments for achieving the final $30 million of the $50 million in cost savings or from the purchases of additional farms. Conrad 820-22. Lazard did not include any additional cost savings associated with the division-level restructuring plan that was adopted after the ITOCHU Transaction because management did not advise Lazard that the remaining initiatives could still be undertaken. Lazard also did not have access to Tesoriero's analysis that supported the $50 million in cost savings, even though Carter consulted with Tesoriero about it in preparation for the Lender Meeting. Lazard did include a sensitivity case in its analysis that contemplated an additional $30 million in annual cost savings. JX 783 at 31. Lazard calculated that achieving these cost savings would increase Lazard's estimate of Dole's value by $345 million, or $3.80 per share. *Id.*

Lazard did not include a sensitivity case for farms because management had not provided specific guidance on this issue. Garner 1283-84. By contrast, Carter had told Murdock's bankers in the Lender Meeting that Dole would acquire $100 million in farms, generating $15 million in annual EBITDA improvement. *See* JX 692 at 3. DeLorenzo admitted at trial that the Board had never suspended or terminated the farm purchase program. DeLorenzo 688.

47

**L.    The Committee Receives Indications Of Interest From Other Bidders.**

After the announcement of Murdock's proposal, the Committee and its advisors received incoming calls from interested parties. The most serious were from two potential financial buyers, Platinum Equity and Apollo, and two potential strategic buyers, ITOCHU and Chiquita. The initial expressions of interest from ITOCHU and Apollo did not develop into offers, and no one focused on them at trial. Platinum Equity floated a figure of $14 per share, but Garner testified credibly that after questioning Platinum Equity, Lazard decided that the offer was not serious.

Chiquita, by contrast, was serious about acquiring all of Dole, including Murdock's stake. Lazard viewed Chiquita as the most promising bidder, in part because Dole and Chiquita had previously come close to finalizing a deal. Because of this view, the Committee and its advisors asked Murdock to entertain an offer from Chiquita. He refused, confirming that he was only a buyer, not a seller.

**M.    The Committee Negotiates With Murdock.**

In late July 2013, with Murdock's artificial deadline of July 31 approaching, the Committee decided to send Conrad to meet with Murdock. The Committee and Lazard had met with Murdock initially on June 24, shortly after Lazard was retained, so that Murdock could make his pitch. After that meeting, Carter's opposition delayed Lazard's access to confidential information, and then Lazard and the Committee had to invest significant time and effort preparing the Committee Projections.

Conrad met with Murdock at his home on July 27, 2013. The Committee and its advisors agreed beforehand that Conrad would not make a counteroffer or accept a

proposal during the meeting, and Conrad told Murdock that. He also told Murdock that the July 31 "deadline was unrealistic unless there was a sensational offer that would wow the committee" and that otherwise the Committee was going to continue its process. Conrad 778-79.

Murdock became upset. He reiterated his demand that the Committee make a decision by July 31 and criticized the pace of the Committee's work. Conrad 778. During what Conrad described as an "arduous" meeting, Murdock pressured Conrad, but Conrad consistently refused to make a counter-offer. Conrad 778-79. Frustrated, Murdock began negotiating against himself, increasing his offer to $12.25, then to $12.50. Conrad 778. Finally, Conrad thanked Murdock and started to leave. While Conrad was walking down the driveway, Murdock called him back and offered $13.05. Conrad 779-80. Conrad reiterated that he was not authorized to accept an offer and left. Conrad 779-80.

**N.     The Committee And Murdock Agree On Price.**

The Committee scheduled a second meeting with Murdock for five days later, on August 1, 2013. This time, Lansing accompanied Conrad, with the rest of the Committee and its advisors available by phone.

The meeting took place at Murdock's offices. Murdock attended with his advisors. Murdock increased his offer to $13.25 per share, stating "That's it, I'm not going to pay any more." Murdock 782. After teleconferencing separately with their team, Conrad and Lansing countered at $14.00. Conrad cited the expression of interest from Platinum Equity at $14 per share as a justification for that price. Murdock met with his advisors

49

separately and then offered $13.50. Conrad and Lansing teleconferenced again with their team, and the Committee decided to accept Murdock's price.

Conrad felt that Murdock "had reached his limit" and "that there was nothing left for him to pay." Conrad 784. Lazard's DCF analysis using the Committee Projections valued Dole at between $11.40 and $14.08, and the $13.50 price fell closer to the top of the range than the midpoint. *See* JX 783 at 29. The price also exceeded the ranges of values generated by Lazard's public company and precedent transaction analyses. *Id*. The Committee's advisors believed that it was a good outcome. Conrad 784. At the time, the Committee and its advisors did not know that the projections Lazard had used lacked material information about planned cost savings and farm purchases.

## O.    The Terms Of The Merger Agreement

After reaching agreement on price, the Committee and its advisors negotiated the terms of the Agreement and Plan of Merger among DFC Holdings, LLC, DFC Merger Corp., Murdock, and Dole (the "Merger Agreement"). Murdock pushed for a two-step transaction with strong deal protections, and he claimed (inaccurately) that the Committee's agreement on price had encompassed those terms. *See* JX 759. The Committee stood firm and insisted on a one-step transaction, a go-shop period, a small breakup fee, and an additional equity commitment from Murdock to ensure the transaction would close.

During the negotiations, without receiving permission from the Committee, Carter and other members of Dole's senior management advised Murdock. They took steps to conceal their involvement by minimizing their written communications, but the record

50

contains sufficient examples to suggest that the communications were more extensive. For example, Carter, Potillo, and Jeff Conner, Dole's Associate General Counsel, helped Murdock's counsel revise an agreement with Murdock's lenders. JX 770. Carter also spoke with Murdock's attorneys about the deal by phone. JX 778. Carter even advised Murdock's attorneys about pro-Murdock terms to obtain in the Merger Agreement. *See* JX 759 at 1. He also consulted with Murdock's attorneys about how to deal with the Committee on other matters. *See* JX 635.

**P.    The New Budget**

While negotiations over the Merger Agreement were ongoing, Carter started Dole's annual budgeting process and instructed Dole's divisions to correct certain unreasonable assumptions made weeks earlier for purposes of the July Projections. On August 8, 2014, acting on Carter's instructions, Dole's Controller sent a memo to management about creating their forecasts. JX 773. The memorandum noted that all operating divisions except Europe would "easily" exceed 4% EBITDA margins, that the new base case EBITDA projections needed to be "at the **high end** of the EBITDA projections" from the July Projections, and stated that the EBITDA margins therefore "must meet a **minimum 4%** target for 2014, with improvements each year thereafter." *Id*. at 1 (emphasis in original). The memo told management to ignore the EBITDA forecasts for years four and five in the July Projections because those forecasts "need to be reassessed, as these years' projections were kept flat from 2016." *Id*. The new projections were supposed to be more favorable in other areas as well, with annual capital expenditures to be forecasted "at no more than 1.25% of divisional revenues," compared

51

to the 1.5% of revenue forecast in the July Projections. *Id.*; JX 783 at 15. The memo emphasized that the materials attached to the email for use in preparing the new projections were "**not to be circulated outside of this distribution group**." JX 773 at 2 (emphasis in original).

If the Committee had seen the new budget or knew about the different assumptions, it might have upended the agreement on price and reset the valuation expectations for Dole. On August 11, 2013, it seemed possible that the Committee might find out. Murdock's and Dole's attorneys were resisting Sullivan & Cromwell on some final points. The Committee had been scheduled to meet to consider the Merger Agreement that day, but on the morning of August 11, Ressler of Sullivan & Cromwell suggested that the Committee would hold off. She cited a Board meeting scheduled for the next day at which Dole's management would present updated information on the budget, and she observed that the Committee could take that information into account. JX 782 at 2.

Ressler sent her email to other lawyers who were working on the Merger for Dole. When they asked Carter about the budget meeting, he lied. Despite having started the budgeting process and given instructions to Dole's controller about the changes to convey to management, Carter claimed to "know nothing about a management team meeting next week." JX 782 at 1. He also wrote that "[t]here are no changes to the operating budget -- I had conversations with Lazard yesterday about our timing of payments in 2013 to husband cash for the closing in light of bank requirements, that's all." *Id.* He concluded, "I don't believe there is any need to delay the merger agreement consideration." *Id.*

Carter also forwarded his response to Murdock's attorneys, who used it to push Sullivan & Cromwell to have the Committee vote on the deal. *See* JX 780; JX 782 at 1.

Later that morning, Murdock called Conrad and left one of his signature voicemails. This time he attacked Ressler and urged Conrad to have the Committee consider the transaction that day.

> Yes, Andrew. David [Murdock], here. It is 20 minutes after 11:00 and I very desperately need to talk to you quickly and if I can possibly get to you. I don't know if this call is going through to you or not. But they are going to postpone the transaction and they will destroy it today if that woman lawyer [referring to Ressler] gets her way. And we're all wondering – Pete [Tennyson] and Michael [Carter] – all of us – are wondering what in the hell do they think they're doing. They've already taken 10 days past the 1st and so they'll destroy it. And I'm urging you not to let them. You have the power to tell them you want a vote today. They are saying they don't want to vote, and they want to get another meeting on Monday.

JX 787. Conrad received the voicemail. Conrad 788.

The Committee meeting went forward that afternoon, and they recommended Murdock's proposal to the Board. Immediately afterwards, the Board met and approved the transaction. The terms of the final transaction included an additional $50 million equity commitment from Murdock plus a 30-day go-shop period during which Dole would pay Murdock a $15 million breakup fee if Dole terminated Murdock's deal to accept a superior proposal.

After the Merger Agreement was signed, Dole made presentations to the rating agencies in September 2013 and to its lenders in October 2013 that utilized forecasts similar to the Committee Projections and significantly higher than the July Projections that Carter gave Lazard. The presentations noted that (i) Dole planned "to increase owned

53

production in bananas, pineapples and selected berries to improve productivity at the farm level," JX 837 at 17, and (ii) the adjusted EBITDA margins for the Fresh Fruit division were expected to "increase by 50 bps from 2013 to 2015 due to increased operating leverage through further investments" in Company-owned farms. JX 845 at 2. Internal management materials entitled "Latin American 2014 Budget and 5 Y[ear] P[lan]" prepared in October 2013, observed that Dole's "5YP presumes we continue investing in additional banana and pineapple company farms." JX 879 at 39.

## Q.     The Transaction Closes.

During the go-shop period, Lazard contacted over sixty parties. Leonard Green & Partners and Platinum Equity executed confidentiality agreements and met with management. Both eventually declined to bid.

Murdock's financing syndicate changed after the Merger Agreement was signed. The final price exceeded what the lending group previously had authorized. Wells Fargo, one of Murdock's long-time bankers, dropped out. Deutsche Bank and the other participating lenders put together the financing.

Dole held a special meeting of stockholders on October 31, 2013. A narrow majority of 50.9% of the disinterested shares voted in favor, 21.2% voted against, 10.5% abstained, and 17.4% did not vote. The transaction closed on November 1, 2013.

## R.     Dole's Performance Shortly After The Transaction

After the Merger closed, Dole bought almost exactly the amount of farms that Carter had predicted at the Lender Meeting. Carter told Murdock's bankers at the Lender Meeting that farm purchases "[e]asily could be $100 [million]" and produce a "$15

54

[million] initial return." JX 692 at 3. Dole met or exceeded both predictions after the take-private. According to a Wells Fargo analyst report dated December 5, 2014, that year Dole spent "$37 million for the acquisition of a pineapple farm and $7 million for the acquisition of a banana farm . . . . In addition, Dole has purchased several farms throughout the year, which require payments in FQ4 exceeding $80 million." JX 924 at 2. A Deutsche Bank report stated that the farms were expected to increase EBITDA by "around $23 million once the acquisitions are fully integrated." JX 920 at 1. Carter testified that Dole purchased a total of "maybe $80, $100 million worth of farms, roughly" in 2014. Carter 985.

The defendants insist that none of these farm purchases could have been foreseen, but all were consistent with Dole's long-term strategy of buying farms. *See, e.g.*, JX 900 at 2. Moreover, Dole actually was considering plans to purchase some of the specific farms before the Merger. Carter had told Murdock's bankers at the Lender Meeting that Dole was considering buying farms in Ecuador, Guatemala, and Chile. JX 699 at 5; JX 692 at 3. In addition, in October 2013, shortly after negotiations with the Committee ended, a Dole presentation indicated that the Company was interested in acquiring seven farms for a total of $75.9 million (including required capital investments for improvements) at an average cash flow return on investment of 30.9%. JX 879 at 41. The list identified a pineapple farm in Costa Rica and banana farms in Costa Rica, Ecuador, Guatemala, Honduras, and Peru. *Id*. at 47. Just one month after the Merger closed, Dole acquired a pineapple farm in Costa Rica for approximately $40 million. Acuña 1198. Dole had identified this farm as an acquisition target in July 2013. Acuña Dep. 16-17.

55

After the Merger closed, Dole achieved more than the $50 million in cost savings predicted after the ITOCHU Transaction. *See* JX 914 at 1. Dole achieved roughly $30 million of cost savings in 2014 and approximately $51 million in 2015. JX 920 at 1. Carter testified that Dole ultimately achieved approximately $70 million in cost reductions, with only $5.5 million attributed to Dole no longer operating as a public company. Carter 984, 979.

## II. LEGAL ANALYSIS

"This case is another progeny of one of our law's hybrid varietals: the combined appraisal and entire fairness action." *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 299 (Del. Ch. 2006) (Strine, V.C.). The Delaware Supreme Court has instructed that when a merger gives rise to both a plenary action for breach of fiduciary duty and a statutory appraisal proceeding, the court should rule on the plenary claims first, because a finding of liability and the resultant remedy could moot the appraisal proceeding. *Cede & Co. v. Technicolor, Inc. (Technicolor Appraisal I)*, 542 A.2d 1182, 1189 (Del. 1988). "[R]egardless of the Court's substantive findings, the plaintiffs are limited to, and statutorily assured of, a single recovery." *Bomarko, Inc. v. Int'l Telecharge, Inc.* (*Bomarko I*), 794 A.2d 1161, 1177 (Del. Ch. 1999)*, aff'd*, 766 A.2d 437 (Del. 2000) (*Bomarko II*).

In the plenary proceeding, the plaintiffs claim that the Merger was not entirely fair. They argue that Murdock, Carter, and DeLorenzo breached their duty of loyalty and are personally liable for damages, and they contend that Deutsche Bank is also liable as

56

an aider and abetter. They also seek to impose liability on DFC Holdings, LLC, one of two entities that Murdock used to effect the Merger.

This decision holds that Murdock and Carter breached their duty of loyalty and are liable to the Class for $148,190,590.18, representing damages of $2.74 per share. The plaintiffs did not prove their case against DeLorenzo or Deutsche Bank.

## A.    The Merger Was Not Entirely Fair.

"When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion." *Ams. Mining*, 51 A.3d at 1239. The Merger was an interested transaction, so entire fairness provided the baseline standard of review. Because the record did not permit a pretrial determination that the defendants were entitled to a burden shift or a lower standard of review, "the burden of persuasion . . . remain[ed] with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction." *Id.* at 1243.

"The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id*. Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id*. Although the two aspects may be examined separately, "the test for

57

fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id*.

Fairness does not depend on the parties' subjective beliefs. Once entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing and fair price." *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary IV)*, 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

### 1. Fair Dealing

The evidence at trial established that the Merger was not a product of fair dealing. This is not a case that requires an overly granular analysis of the *Weinberger* factors. Carter engaged in fraud. The concept of entire fairness "certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation." *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985). According to the common law nostrum, *fraus omnia corrumpit*—fraud vitiates everything. Here it rendered useless and ineffective the highly commendable efforts of the Committee and its advisors to negotiate a fair transaction that they subjectively believed was in the best interests of Dole's stockholders.

58

### a. Timing and Initiation

Under *Weinberger*, the concept of fair dealing encompasses an evaluation of how the transaction was timed and initiated.[12] The scope of this factor is not limited to the controller's formal act of making the proposal; it encompasses actions taken by the controller in the period leading up to the formal proposal. For approximately eighteen months, Murdock had planned on taking Dole private after first separating and realizing the value of Dole's higher-margin businesses. This strategy was reflected in the Tesoriero Memo and Murdock's discussions with Deutsche Bank about a spinoff-plus-privatization structure. It was corroborated by Murdock's sales of assets, including Lanai, and his discussions with Deutsche Bank about the availability of the resulting capital for that purpose. The ITOCHU Transaction set the stage for the planned freeze-out to unfold. But rather than making a merger proposal when Dole's stock was trading at high levels

---

[12] *See, e.g., Glassman v. Unocal Exploration Corp.*, 777 A.2d 242, 248 (Del. 2001) (reaffirming teaching of *Weinberger* that fairness must take into account whether "the merger was timed to take advantage of a depressed market, or a low point in the company's cyclical earnings, or to precede an anticipated positive development"); *Rabkin*, 498 A.2d at 1106 (reversing dismissal of complaint challenging fairness of freeze-out merger where plaintiff alleged that controller timed the proposal to occur after a one-year commitment to pay a higher price expired); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *14 (Del. Ch. Oct. 2, 2009) (explaining that "[p]laintiffs could prevail at trial on the issue of fair dealing if they were able to establish that the price of the minority shares was depressed as a result of Hammons's [pre-merger] improper self-dealing conduct"); *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1335 (Del. Ch. 1987) (explaining that a controlling stockholder is "obliged not to time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price"); *see also Braasch v. Goldschmidt*, 199 A.2d 760, 763 (Del. Ch. 1964) (finding that complaint stated claim based on actions taken before short-form merger in which "the merger was the final step of a conspiracy to accomplish an unlawful end by unlawful means").

following the announcement of the ITOCHU Transaction, which took into account DeLorenzo's explanation of the $50 million in run-rate cost savings that Dole could achieve, Carter first primed the market by pushing down the stock.[13]

"[A] calculated effort to depress the [market] price" of a stock "until the minority stockholders [are] eliminated by merger or some other form of acquisition" constitutes unfair dealing. *Sealy Mattress*, 532 A.2d at 1336. It is an example of the "prototype instance in which the timing of a merger would itself likely constitute a breach of a controlling shareholder's duty" under the entire fairness standard, namely, "when it could

---

[13] Academic research has found a correlation between management-led buyouts and lowered guidance, increased reserves, and other measures that reduce the apparent performance of a company during periods before the announcement of the buyout. "The US literature on accounting manipulation states that downward earnings management prior to [management buyouts] is expected." Yaping Mao & Luc Renneboog, *Do Managers Manipulate Earnings Prior to Management Buyouts?* 5 (Center Discussion Paper Series No. 2013-055, October 11, 2013); *see* James Ang, Irena Hutton & Mary Anne Majadillas, *Manager Divestment in Leveraged Buyouts*, 20 European Fin. Mgmt. 462 (2013) (finding positive pre-transaction earnings management when managers disinvest in a third-party leverage buyout but negative earnings management when managers retain a significant ownership stake after the transaction); Patricia Dechow, Weili Ge & Catherine Schrand, *Understanding Earnings Quality: A Review Of The Proxies, Their Determinants And Their Consequences*, 50 J. Acc. & Econ. 344 (2010) (finding that managers have options to make different accounting choices that vary depending on their misrepresentation objective); Y. Woody Wu, *Management Buyouts And Earnings Management*, 12 J. Acc. & Fin. 373 (1997) (finding that earnings manipulation in management buyouts caused an average decrease in price of 18.6%); Susan E. Perry & Thomas H. Williams, *Earnings Management Preceding Management Buyout Offers*, 18 J. Acc. & Econ. 157 (1994) (finding evidence of downward accrual management); *see also* Paul E. Fisher & Henock Louis, *Financial Reporting And Conflicting Managerial Incentives: The Case Of Management Buyouts*, 54 Mgmt. Sci. 1700 (2008) (finding downward earnings manipulation generally decreases when the managers require large amounts of external financing, but that the effect is smaller if the company has significant fixed assets to serve as collateral). The behavior in this case provides a real-world example of this phenomenon.

be shown both (1) that the minority was financially injured by the timing (i.e., from their point of view it was an especially poor time to be required to liquidate their investment) and (2) that the controlling shareholder gained from the timing of the transaction what the minority lost." *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 599 (Del. Ch. 1986) (Allen, C.).

As described in the Factual Background, Carter departed from Dole's historic practice by providing earnings guidance, and the guidance he provided changed Dole's estimate of its ability to achieve cost savings after the ITOCHU Transaction. DeLorenzo had told the markets that Dole could achieve $50 million in cost savings, with $20 million implemented immediately in 2012 and the remaining $30 million implemented in 2013. By the end of 2013, Dole would have achieved the full run-rate of $50 million per year. In his January 2013 press release, Carter told the markets that Dole's "current expectation" was that Dole only would achieve "2013 planned cost savings in the $20 million range." JX 384. Dole's stock price dropped 13% after the announcement.

It is certainly possible for cost estimates to change, but in this case the evidence at trial forced me to conclude that Carter's reduced estimate was false. Deutsche Bank had done diligence on Dole's cost-cutting plan and believed it was reasonable. DeLorenzo backed it, and he was a credible witness. Other analyses suggested the total cost savings could be higher. *See* JX 1615; JX 389. Carter was not a credible witness on this issue, and he did not provide a believable explanation for the reduced figure. *See* Factual Background, Part F.1, *supra*.

61

Not coincidentally, after the Merger closed, Dole told the analysts who covered its publicly traded debt that Dole had completed over $30 million in additional cost cutting. A Deutsche Bank analyst covering Dole drew the obvious conclusion: "We would have expected a rationalization of the business post the [ITOCHU Transaction] but it seems like the company is just getting around to it now." JX 914. Logically, Dole should have achieved these savings as a result of the ITOCHU Transaction, not the Merger. In the ITOCHU Transaction, Dole sold approximately half of its business, significantly reducing the size of the Company. As DeLorenzo and Deutsche Bank recognized, the sale naturally presented the opportunity for major cost cutting. The Merger did not. After Murdock bought it, the Company was essentially the same, with only $5.5 million of savings attributed to public company costs.[14]

For Carter to have intentionally given the market a subterranean estimate of Dole's anticipated cost savings matches up with his unilateral and pretextual cancellation of the

---

[14] According to the defendants, Murdock and Carter could not achieve the cost savings they generated after the Merger as long as Dole was a public company ostensibly because the cuts were too "risky" for public stockholders. Carter 982. That argument turns traditional principles of limited liability and diversification upside down. Diversified public stockholders should be less risk-averse, precisely because of their diversification, than a large stockholder with non-diversified risk. *See, e.g., Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) ("Shareholders can diversify the risks of their corporate investments. Thus, it is in their economic interest for the corporation to accept in rank order all positive net present value investment projects available to the corporation, starting with the *highest risk adjusted rate of return first*. Shareholders don't want (or shouldn't rationally want) directors to be risk averse."). The contention that the post-ITOCHU cuts had to be made after the Merger was a face-saving rationalization of self-interested behavior. The savings from discontinuing Dole's status as a public company stand on a different footing.

62

stock repurchase program that the Board adopted on May 8, 2013. As discussed in the Factual Background, Murdock had pushed for Dole to engage in a self-tender offer that would have increased his ownership above a mathematical majority and helped him pay a lower overall price in an eventual freeze-out. *See, e.g.,* JX 404; JX 447. Led by Conrad and Weinberg, the Board opted instead for a program of open market purchases that would provide greater benefits to Dole and its unaffiliated stockholders. Later that month, the Board also approved the plan for Dole to purchase three new refrigerated transport ships. On May 28, just under three weeks after the Board approved the repurchase plan, Carter announced that share repurchases had been "suspended indefinitely" so that Dole could use its capital on the ships. JX 582. Dole's stock price tumbled 10% after the announcement.

Carter knew the announcement would drive down the stock price. JX 592; Carter 1101. Carter had not informed the Board of this decision or suggested any connection existed between the ships and the repurchase plan. Dole's outside directors only learned of the decision from public sources. At trial, Carter claimed that he was worried about covenants in Dole's debt, but they would not have been tripped even if Dole spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for the ships. Regardless, Dole did not have to do either. Dole was authorized to repurchase shares in management's discretion over the course of a year; it did not have to spend the full $200 million and not right away. The contract for the ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014. The evidence establishes that the ship acquisition and share repurchase programs were both feasible.

63

Carter did not cancel the stock repurchase plan because doing so would benefit Dole. He did it to make Dole's stock price drop in advance of Murdock's planned merger proposal.[15]

---

[15] He also did it to spite the outside directors and teach them a lesson about who was really in charge. During pre-trial proceedings, Murdock and Carter's response to the outside directors' opposition to the self-tender was part of what factored into my conclusion that triable issues of fact existed regarding the Committee's independence. Delaware decisions have long worried about a controller's potential ability to take retributive action against outside directors if they did not support the controller's chosen transaction and whether it could cause them to support a deal that was not in the best interests of the company or its stockholders. *See, e.g., Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 428 (Del. 1997) (describing the inherent coercion present when a controlling stockholder is on the other side of a transaction as involving the "risk . . . that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder"); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 617-19 (Del. Ch. 2005) (Strine, V.C.) (describing case law); *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002) (same). The Delaware Supreme Court has confirmed that controlling stockholder status does not, standing alone, give rise to concern. *In re Cornerstone Therapeutics Inc. S'holders Litig.*, 115 A.3d 1173, 1183 (Del. 2015). At the same time, Delaware decisions recognize that when controllers actually make retributive threats, that fact is evidence of unfair dealing. *See Kahn v. Lynch Commc'n Sys., Inc. (Lynch)*, 638 A.2d 1110, 1120 (Del. 1994); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 465 (Del. Ch. 2011) (citing threats made by controlling stockholder as "evidence of unfairness"); *Hammons*, 2009 WL 3165613, at *12 n.38 ("[N]either special committee approval nor a stockholder vote would be effective if the controlling stockholder engaged in threats, coercion, or fraud."); *cf. Pure Res.*, 808 A.2d at 445 (reviewing tender offer by controlling stockholder under lower standard of review as long as "the controlling stockholder has made no retributive threats").

In this case, just weeks before Murdock proposed the Merger, Murdock and Carter gave the outside directors a demonstration of the costs and futility of resistance. When Murdock and Dole management proposed the self-tender, Conrad and Weinberg opposed it. As detailed in the Factual Background, Murdock was furious and did everything he could to pressure both of them into changing their views. After the directors held an executive session on May 6, 2013, Murdock petulantly absented himself from the next Board meeting on May 8. After Conrad and Weinberg convinced the Board to adopt the program of open market repurchases, Murdock left a threatening message for Weinberg

64

### b.     Transaction Negotiation

Under *Weinberger*, fair dealing encompasses questions of how the transaction was negotiated. The defendants have relied on the indisputably excellent work of the Committee and its advisors. But even the most motivated, skilled, and well-advised special committee cannot achieve a fair result if those in control of the corporation deliberately undermine its efforts.[16]

"[A]n important element of an effective special committee is that it be fully informed in making its determination."[17] "[I]n order to make a special committee

---

that was "not for public consumption." Weinberg Dep. 33. A few days later, Carter called Weinberg and demanded his resignation, citing a "lack of collegiality at the board level" due to Weinberg's "personality clash" with Murdock. Carter Dep. 20. Weinberg resigned, and the full Board accepted his resignation. Less than three weeks later, Carter cancelled the repurchase program.

Before evaluating the evidence at trial, it seemed to me that these events provided an extreme example of retributive action that would influence the thinking and actions of an outside director. Murdock and Carter had shown the outside directors that if they went in a different direction than Murdock wanted, they risked losing their Board seats, and the decision they staked their positions on would be nullified. As discussed, having reviewed the record at trial and heard Conrad testify, I am convinced that the Committee was in fact independent, notwithstanding Murdock and Carter's shot across the bow.

[16] *See Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1284 (Del. 1989) ("[W]hen a board is deceived by those who will gain from such misconduct, [including officers of the corporation,] the protections girding the decision itself vanish."); *cf. Lynch*, 638 A.2d at 1120 (holding that even if the members of a special committee were "truly independent and . . . performed their tasks in a proper manner," that alone would not be sufficient to show fair dealing) (citing *Am. Gen. Corp. v. Texas Air Corp.*, 1987 WL 6337, at *4 (Del. Ch. Feb. 5, 1987)).

[17] *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *10 (Del. Ch. Dec. 21, 2005); *see also Lynch*, 638 A.2d at 1120-21 ("Particular consideration must be given to evidence of whether the special committee was truly independent, fully informed and had the freedom to negotiate at arm's length.").

structure work it is necessary that a controlling shareholder . . . disclose fully all the material facts and circumstances surrounding the transaction."[18] There are certain categories of negotiating information that the controlling stockholder need not share, such as "information disclosing the top price that a proposed buyer would be willing or able to pay, or the lowest price that a proposed seller would accept,"[19] but the categories of information that the controller must disclose include:

1) . . . all of the material terms of the proposed transaction;

2) . . . all material facts relating to the use or value of the assets in question to the beneficiary itself. Such facts would include alternative uses for assets or "hidden value" (e.g., there is oil under the land subject to sales negotiation);

3) . . . all material facts which it knows relating to the market value of the subject matter of the proposed transaction. Such facts would include[,] for example[,] forthcoming changes in legal regulation or technological changes that would affect the value of the asset in question either to the subsidiary or to others.

---

[18] *Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *15 (Del. Ch. Mar. 21, 1996) (Allen, C.) (internal quotation marks omitted). In *Tremont I*, Chancellor Allen held that the special committee functioned effectively and shifted to the plaintiffs the burden to prove that the transaction price was unfair. *Id.* at *1. On appeal, the Delaware Supreme Court held that the special committee had not functioned effectively and reversed for a new determination of fairness with the burden properly assigned. *Tremont II*, 694 A.2d at 429-30. The Delaware Supreme Court did not reverse any of the Chancellor's legal rulings, although it did disagree with the use of the term "privileged" to describe information that a controller can withhold during a negotiation. *Id.* at 432. This decision cites aspects of *Tremont I* that were not reversed on appeal. In light of this disclosure, citations to *Tremont I* omit the cumbersome "rev'd on other grounds."

[19] *Tremont I*, 1996 WL 145452, at *15; *accord Pure Res.*, 808 A.2d at 451.

66

*Tremont I*, 1996 WL 145452, at \*16 (footnotes omitted). These categories are intended to encompass "*all material information known to the fiduciary except that information that relates only to its consideration of the price at which it will buy or sell and how it would finance a purchase or invest the proceeds of a sale.*" *Id.*

Implicit in the expectation that the controller disclose this information is the requirement that the controller disclose it accurately and completely. The controller must believe that the disclosures are true and cannot deliberately withhold material information or otherwise immaterial information that is nevertheless necessary to make the disclosed information complete and non-misleading. The fair dealing element of the entire fairness standard mandates that all fiduciaries, including the controller and its representatives, comply with

> the duty of candor owed by corporate fiduciaries to disclose all material information relevant to corporate decisions from which they may derive a personal benefit. . . . The duty of candor, integral to fair dealing, dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge *to mislead others in the performance of their own fiduciary obligations.*[20]

---

[20] *Bomarko I*, 794 A.2d at 1180 (internal quotation marks omitted; emphasis added); *accord HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (Strine, V.C.) (explaining that directors have an "unremitting obligation to deal candidly with their fellow directors" (internal quotation marks omitted)); *see Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 387, 413 (Del. Ch. 1999) ("No doubt Fleming [the controlling stockholder] had a duty of disclosure to the ABCO board of directors in seeking their approval."). Even in a short-form merger, where appraisal is the exclusive remedy, a court of equity has "the ever-present power . . . to deal with illegality or fraud." *Stauffer v. Standard Brands, Inc.,* 187 A.2d 78, 80 (Del. 1962); *accord Braasch*, 199 A.2d at 764. *See generally In re Unocal Exploration Corp. S'holders Litig.*, 793 A.2d 329, 347 (Del. Ch. 2000) ("*Stauffer* and *Braasch* remain authoritative expressions of the law."), *aff'd sub nom. Glassman v. Unocal Exploration Corp.,* 777 A.2d 242 (Del. 2001).

To state what should be obvious, a controller cannot engage in fraud. Nor can a corporate officer, even if his principal loyalty is to a controller who is his boss and source of post-transaction employment. To be blunt, if a duly empowered committee asks for information, a corporate officer, employee, or agent has a duty to provide truthful and complete information.[21]

Accurate and up-to-date information about the company's financial performance is particularly important to a committee's work. Withholding the company's latest "projections, and knowledge of their existence, from the [Special] Committee and its advisors" is "without more . . . enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders." *Emerging Commc'ns*, 2004 WL 1305745, at *35.

The Committee asked Carter for updated management forecasts that reflected Dole management's "current best views about the prospects of [the] business." Garner 1248. Carter constructed a set of projections that contained falsely low numbers. In place of

---

[21] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 544 (Del. Ch. 2003) (Strine, V.C.) (holding that the duty of an officer-director was to "provide the special committee and its advisors with all the information they asked for, because they were entitled to all the information the company had"); *see Kalisman v. Friedman*, 2013 WL 1668205, at *3 (Del. Ch. Apr. 17, 2013) ("A director's right to information is essentially unfettered in nature.") (internal quotation marks omitted); *accord Schoon v. Troy Corp.,* 2006 WL 1851481, at *1 n. 8 (Del. Ch. June 27, 2006); *Intrieri v. Avatex,* 1998 WL 326608, at *1 (Del. Ch. June 12, 1998); *Belloise v. Health Mgmt., Inc.*, 1996 Del. Ch. LEXIS 127, at *36 (Del. Ch. June 11, 1996) (Allen, C.).

Dole's usual bottom-up approach, Carter and the management team created the new projections from the top down. Garner described the process as follows:

> [Dole management] used a different approach than I normally see in which they basically did not start out by saying what's revenues, what's expenses, what's the difference and there's the profit. They basically said, let's look at the profit line, the EBITDA line that had come from the three-year process and let's see what's different from the way we now see the world in terms of pricing and costs of the system and how the bottom line would change given management's new view of the world. And then they worked their way back up to the top, you know, in other words, in terms of what the revenue was. They had a high and a low case and they looked in the middle and they developed it on the way up. It was – suffice it to say, it was not a particularly rigorous process in our view.

Garner Dep. 25.

The Committee and Lazard had immediate concerns about the July Projections:

- Dole management could not provide a basis for the reduction in revenue forecasts as compared to the December Projections.

- The projections were inconsistent with what Dole gave its lenders in April 2013 for the post-ITOCHU Transaction refinancing.

- The forecasts were inconsistent with what the Board reviewed just weeks earlier when approving the purchase of the new ships.

- The growth forecasted for 2014 and 2015 was "just an extrapolation based on a mathematical formula, not on real information." Conrad Dep. 26.

- Dole management inexplicably kept flat the EBITDA estimates for 2016 and 2017 except for a small adjustment for the new cargo ships.

Conrad concluded that the July Projections were not "an accurate representation of the value of the Company" and that the Committee would "have to find an independent way to evaluate the value of the company." Conrad Dep. 25. Garner believed that "management had taken a meat cleaver to the projections in a way that it would be very

difficult, if not inappropriate, for a committee to weigh these projections as the basis for determining the adequacy of a price." Garner Dep. 32; *accord* Garner 1249, 1313.

Conrad and Garner were too polite and professional to come right out and say it, but a court has to call things as they are. The projections Carter provided were knowingly false. Carter intentionally tried to mislead the Committee for Murdock's benefit.

The contrast between what Carter told the Committee and what he told Murdock's lenders and advisors during the Lender Meeting the next day confirms the fraudulent nature of the July Projections. So does the contrast between what Carter told the Committee and the instructions he gave a month later for the preparation of the budgets and projections that would be used to run the Company post-Merger. *See* Factual Background, Part P, *supra*.

Faced with Carter's fraud, the Committee and Lazard created, on an expedited basis, their own set of projections. Their heroic efforts have enabled the defendants to argue that Carter's misconduct was a "no harm, no foul" situation. The Committee and Lazard did succeed in generating a credible and reliable projection regarding Dole's business—the most credible and reliable projection in the case—but they could not do so for areas where they did not receive full or accurate information.

The Committee and Lazard never received full and accurate information about the cost savings that Dole could achieve. Dole management failed to share with the Committee or Lazard the analysis supporting the $50 million in cost savings that Tesoriero prepared, even though Carter considered it and contacted Tesoriero about it before meeting with Murdock's lenders. Dole management also did not provide the

Committee and Lazard with accurate information about Dole's farm purchases, and as a result Lazard removed any effect of additional farm purchases from its analysis. *See* Factual Background, Part K, *supra.* By providing the Committee with false information, Carter ensured that the process could not be fair.

Although the false projections were the most egregious of Carter's activities, he interfered with and obstructed the Committee's efforts to manage the process and negotiate with Murdock in other ways as well:

- At the outset, Carter sought to restrict the Committee's mandate and limit the Committee to a simple "up or down" decision on Murdock's offer, rather than having the ability to consider and explore the viability of potentially superior alternatives.

- Carter resisted the Committee's hiring of Lazard, sought to steer the Committee towards BAML, a banker with a prior relationship with Dole and Murdock, and attempted to limit the scope of Lazard's activities.

- When the Committee asserted its authority to enter into confidentiality agreements on behalf of the Company, Carter refused to go along, insisting that it was his job. Through Carter, Murdock thereby gained a window into the Committee's actions that he should not have had.

- Carter secretly assisted Murdock and his advisors in preparing a hostile tender offer for use if the Committee did not accede quickly enough.

- Carter secretly convened the Lender Meeting, which was a clear violation of the Process Letter established by the Committee.

- After the Committee caught wind that Deutsche Bank had attended a meeting with management and had access to the Company's data room, Carter did not come clean about the full scope of the Lender Meeting, its subject matter, or attendees.

- When the Committee instructed Carter to cancel Deutsche Bank's access to the data room, Carter refused.

- Carter secretly advised Murdock on how to negotiate against the Committee and provided advice to Murdock and his counsel on deal terms and agreements.

71

Given Carter's activities, the negotiation of the Merger was the antithesis of a fair process. Through his actions, Carter "render[ed] the Special Committee ineffective as a bargaining agent for the minority stockholders," notwithstanding the Committee's valiant efforts. *Emerging Commc'ns*, 2004 WL 1305745, at *35.

### c.      Transaction Structure And Approval

Carter's fraud tainted the approval of the Merger by the Committee, as well as the stockholder vote. Perhaps, with the benefit of full information, the Committee would have approved the Merger anyway.  Whether they would have approved the transaction "is inherently unknowable because there is no way to learn what [the Committee would have done] in the absence of [the fiduciaries'] disloyal conduct." *Bomarko*, 794 A.2d at 1184.

Likewise, perhaps if the stockholders had full information about Murdock and Carter's activities, both before and during the negotiation process, they might nevertheless have voted for the deal. That outcome is also impossible to know. Because both protective procedures were tainted, neither provides evidence of fairness.

There are features of the Merger Agreement which, on different facts, might provide evidence of fairness. The Committee obtained a go-shop provision with a low break-up fee, and Lazard diligently sought out other bidders. If Murdock had committed

to support an alternative transaction, then the failure of a higher bidder to come forward would be a significant indicator.[22]

But Murdock controlled over 40% of Dole's voting power, and he was not a seller. He made that clear in his original proposal. He had affirmed that fact in his meetings with Conrad. He had confirmed it separately when the Committee asked him to entertain a proposal from Chiquita. Conrad had to inform potential bidders that Murdock would not sell his Dole shares or partner with them. On the facts of this case, the go-shop was cosmetic.

### 2. Fair Price

The second aspect of the entire fairness inquiry is fair price. "The fair price analysis is part of the entire fairness standard of review; it is not itself a remedial calculation." *Reis*, 28 A.3d at 465. For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness. "The value of a corporation is not a point on a line, but a range of reasonable values . . . ." *Cede & Co. v. Technicolor,*

---

[22] *Compare Cysive,* 836 A.2d at 538 (noting that the controlling stockholders "were enthusiastic supporters of the effort to find a buyer or strategic partner for [the company]," and consequently, the lack of any higher bid provided evidence that the transaction price was a fair price), *and Union Illinois 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.,* 847 A.2d 340, 350 (Del. Ch. 2004) (Strine, V.C.) (finding merger price was a reliable indicator of the company's value where the company's largest stockholder was willing to sell its stake and the sales process was not flawed in any material respect), *with In re First Boston, Inc. S'holders Litig.,* 1990 WL 78836, at *7 (Del. Ch. June 7, 1990) (Allen, C.) ("[T]he fiduciaries' position may preclude the emerge[nce] of alternative transactions at a higher price.").

*Inc.*, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del. 2005). When evaluating the fair price aspect of the entire fairness standard of review, the court considers whether the transaction was one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."[23] "A court readily could conclude that a price fell within the range of fairness and would not support fiduciary liability, and yet the point calculation demanded by the appraisal statute could yield an award in excess of the merger price."[24]

"The range of fairness permits a court to give some degree of deference to fiduciaries who have acted properly; it is not a rigid rule that permits controllers to impose barely fair transactions." *Reis*, 28 A.3d at 466. "The range of fairness concept has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections."[25]

---

[23] *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary III)*, 663 A.2d 1134, 1143 (Del. Ch. 1994) (Allen, C.), *aff'd*, *Technicolor Plenary IV*, 663 A.2d 1156; *accord Tremont I*, 1996 WL 145452, at *1 ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept.").

[24] *Reis*, 28 A.3d at 466; *compare Technicolor Plenary IV*, 663 A.2d at 1176-77 (affirming that merger consideration of $23 per share was entirely fair), *with Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 30 (Del. 2005) (awarding fair value in appraisal of $28.41 per share).

[25] *Id.; see, e.g., M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999) ("A merger price resulting from arm's-length negotiations where there are no claims of collusion is a very strong indication of fair value."); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 6, 1991) ("The most persuasive evidence of the fairness of the $21 per share merger price is that it was the result of arm's-length

74

Fair price can be the predominant consideration in the unitary entire fairness inquiry.[26] Most often, however, the two aspects of the entire fairness standard interact. "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."[27]

---

negotiations between two independent parties, where the seller . . . was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available. The fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair.").

[26] Even a controller that has effected a squeeze-out unilaterally with no process at all conceivably could prove at trial that the transaction was entirely fair. Envision, for example, an altruistic controller who is the sole director of a privately held company and who owns a majority of the shares with the balance held by the company's employees. For idiosyncratic reasons, the controller wishes to eliminate the minority. At the same time, because of the controller's relationship with the employees, the controller wishes to provide an indisputably generous price. The controller implements the deal unilaterally via a one-page merger agreement, approves it at the board level with a unanimous written consent, and approves it at the stockholder level by written consent. The concept of "process" is non-existent, but even under those circumstances, I believe that a controller who proved that the price was indeed fair would not have breached his duties. *Cf. In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013) (holding that fiduciaries did not breach their duties when they failed to follow a fair process yet nevertheless approved a transaction that yielded a fair price).

[27] *Reis*, 28 A.3d at 467; *accord Ross Holding & Mgmt. Co. v. Advance Realty Gp., LLC,* 2014 WL 4374261, at *33 (Del. Ch. Sept. 4, 2014) ("Robust procedural protections may support a determination that price was fairly within a range of reasonable values, and a failure of process may prevent a Court from reaching such a conclusion."); *see William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011) ("Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the sales process."); *Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Gentile v. Rossette*, 2010 WL 2171613, at *9 (Del. Ch. May 28, 2010) ("From a tainted process, one should

The fact that negotiations occurred is not dispositive. "It is not sufficient for . . . directors to achieve the best price that a fiduciary will pay if that price is not a fair price." *First Boston*, 1990 WL 78836, at *7. Nor is it sufficient to obtain a fair price if that price is not the best alternative available for the corporation and its stockholders. *Id.*

The principal evidence on the issue of fair price consists of the expert opinions at trial, the Committee's negotiations, Lazard's fairness opinion, and market indications. Taken together, these sources indicate that without accounting for Carter's fraud, the $13.50 per share price fell within a range of fairness. After accounting for Carter's fraud, the $13.50 per share price represents a closer call, but still may have fallen within the lower end of a range of fairness.

The opposing expert opinions presented at trial adopted widely divergent views of the value of Dole, as is often the case in valuation litigation. *See In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 556-59 (Del. Ch. 2014). Relatively speaking, the plaintiffs' expert was more helpful, because his work demonstrated how different assumptions and inputs affected Dole's value. The defense expert did little more than provide a second fairness opinion using pro-defendant assumptions. Lazard's work was far more credible. As already noted, it was thorough and balanced, and it was prepared for the benefit of the Committee as part of their consideration of the transaction, rather than by an expert

---

not be surprised if a tainted price emerges."); *Bomarko I*, 794 A.2d at 1183 ("[T]he unfairness of the process also infects the fairness of the price."); *HMG/Courtland*, 749 A.2d at 116 (holding that the defendants did not satisfy their burden by showing that the price was "within the low end of the range of possible prices that might have been paid in negotiated arms-length deals" where "[t]he process was . . . anything but fair").

retained by the defendants to help them defeat the plaintiffs' claims. In the final analysis, neither of the parties' experts provided compelling evidence about the fairness or unfairness of the price.

If the Committee and Lazard had not been misled, then the Committee's negotiations and Lazard's analysis would have provided powerful evidence of fairness. But Carter's actions tainted both the negotiation process and Lazard's work product. Methods of valuation "are only as good as the inputs to the model." *Neal v. Alabama By-Products Corp.*, 1990 WL 109243, at *9 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del. 1991).

Modifying Lazard's discounted cash flow ("DCF") analysis to take into account the information that Carter misrepresented or withheld suggests that the $13.50 per share price may have been below the range of fairness. In its DCF analysis, Lazard determined that the range of fair value for Dole's common stock at the time of the Merger was between $11.40 and $14.08. In the areas where Lazard received complete information, the Committee Projections and Lazard's DCF provide the best insight into Dole's business and its value at the time of the Merger. But the Committee Projections require adjustments for the areas where the Committee and Lazard were misled.

The first issue is cost-cutting. The evidence showed that Murdock and Carter delayed Dole's cost-cutting program until after the freeze-out, then achieved more than $30 million in incremental savings. In its sensitivity table, Lazard calculated that an incremental $30 million cost savings would justify an increase in price of $3.80 per share.

77

The second issue is farm purchases. At the Lender Meeting, Carter predicted that Dole easily could purchase $100 million in new farms. The plaintiffs' expert, Kevin Dages, calculated that purchasing an incremental $28.6 million in farms in Ecuador would have increased Dole's value by $1.22 per share. *Compare* JX 1590 at 108 *with id.* at 106. In making this calculation, Dages used 3.2% both as his perpetual growth rate and to project cash flows in years four and five. Lazard used 1.5%, which this decision adopts for consistency. Modifying these inputs reduces the value of an incremental $28.6 million in farms to $0.87 per share. Scaling up the benefit proportionately for Carter's $100 million in farm purchases yields incremental value of $3.04 per share.

At the time of the Merger, there was obviously some uncertainty about how much Dole actually could achieve in cost savings, as well as the number of farms that Dole could buy and the value they would generate. Both undertakings were riskier and less certain than Dole's established business. In my view, it would overvalue the incremental cash flows available from these sources to treat them for valuation purposes as being just as certain as the cash generated by Dole's core operations. As discussed below, this decision finds that for purposes of this case, a more reasonable estimate of the cost savings is $1.87 per share, and a more reasonable estimate of the value of the planned farm purchases is $0.87 per share. *See*, *infra*, Part D.

Adding the full value of the incremental cost savings and farm purchases ($6.84 per share) increases the range of fair value implied by Lazard's DCF to $18.24 to $20.92. Adding what this decision determines to be a more reasonable assessment of the value of

those initiatives ($2.74 per share) increases the range to $14.14 to $16.82. The Merger price falls below both ranges.

The defendants have argued vociferously—nigh desperately—that the court cannot consider anything that happened after the Merger closed and must ignore both the cost savings that Dole actually achieved, as well as its farm purchases. "Delaware law is clear that 'elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered.'" *Del. Open MRI*, 898 A.2d at 315 (quoting *Weinberger*, 457 A.2d at 713). "In essence, when the court determines that the company's business plan as of the merger included specific expansion plans or changes in strategy, those are corporate opportunities that must be considered part of the firm's value." *Id.* at 315 n.51.

> Obviously, when a business has opened a couple of facilities and has plans to replicate those facilities as of the merger date, the value of its expansion plans must be considered in determining fair value. To hold otherwise would be to subject our appraisal jurisprudence to just ridicule. The dangers for the minority arguably are most present when the controller knows that the firm is on the verge of break-through growth, having gotten the hang of running the first few facilities, and now being well-positioned to replicate its success at additional locations—think McDonald's or Starbucks.

*Id.* at 315-16. This is what Dole was doing with the cost savings and farm purchases. The plans to cut costs and buy farms to improve profits were part of Dole's "operative reality" on the date of the Merger.[28]

---

[28] *See id.*; *accord Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 499 (Del. 2000) (holding that post-closing evidence that validated a pre-merger forecast was admissible to show that "plans in effect at the time of the merger have born fruition"); *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289, 298-99 (Del. 1996) (requiring that valuation include

79

The modified DCF analysis suggests that with the benefit of full information about Dole's value, including its plans for cost savings and farms, the Merger price was not fair. That said, the DCF methodology was not the only method Lazard used, and the fact that the modified calculations in this decision generate ranges above the deal price does not mean that Lazard would have made the same judgments or done the math the same way. Even if Lazard agreed with the figures in this decision, it does not necessarily mean that the firm would have concluded that the Merger price of $13.50 per share fell below

value of business plans in existence at the time of the merger); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2014 WL 2042797, at \*4 (Del. Ch. May 19, 2014) ("It is clear from our case law that, where a company begins to implement business plans, revenues from those plans must be accounted for in an income-based valuation method."), *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) (ORDER); *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 910 (Del. Ch. 1999) (discussing law governing incorporation in valuation of plans in existence at the time of the merger); *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 697 (Del. Ch. 1996) (considering multiple post-closing events in determining the fairness of the merger price). *See generally* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 146 (2005) ("Remember that the company is worth not only the present value of the free cash flow from its current assets, but also the free cash flows generated by the reinvestment strategy that it pursues. The development of the cornfield is a reinvestment of the company's free cash flow and, although the actual investments are not made until after the squeeze-out, the plans are in place before the squeeze-out."); John C. Coffee, Jr., *Transfers of Control and the Quest for Efficiency: Can Delaware Law Encourage Efficient Transactions While Chilling Inefficient Ones?*, 21 Del. J. Corp. L. 359, 418 ("Although the idea [of excluding elements of value arising from the accomplishment or expectation of the merger] makes some sense in the arm's-length transaction where the dissenting shareholder is truly opting out, it is misapplied in squeeze-outs where the shareholder is being expelled and where those who remain may be exploiting asymmetric information."). Although these cases focus on appraisal, the valuation principles and standards for determining statutory fair value are the same as those used to evaluate the fair price aspect of the entire fairness test. *See Orchard Enters.*, 88 A.3d at 30 & n.11 (collecting cases). Additionally, "[i]n an entire fairness case, where the influence of control is important, there is a sucker insurance purpose to such evidence." *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 812 n.177 (Del. Ch. 2011) (Strine, C.), *aff'd* 51 A.3d 1213 (Del. 2012).

the range of fairness. The firm may have concluded that the price was still fair, albeit at towards the lower end of fairness.

There are also market indicators. The defendants relied on every transaction that Dole had considered since Murdock's discussion with Del Monte in 2009, as if Dole had been engaged in an ongoing, multi-year market check. That was a decent try for purposes of litigation, but it was not what actually happened. The only time Murdock really considered selling Dole was after the financial crisis, when he and Dole were overburdened by debt. He solved his difficulties by taking Dole public. From that point on, the only third-party transaction involving all of Dole that Murdock seriously considered was the Chiquita deal, which was really an acquisition by Dole of Chiquita and would have expanded Murdock's empire. Otherwise Murdock was not a seller. If someone had approached him with a blow-out price he likely would have considered it, but he placed a high value on the benefits of control. He was particularly unwilling to sell during the period surrounding the Merger, which is the only relevant timeframe.

The defendants have also used metrics implied by various transactions involving Dole and its peers (Chiquita and Del Monte) to show that the Merger was fair. Taken together, these indicators point in the same direction as the Lazard analysis: Without information about Dole's cost savings and farm purchases, the $13.50 price was within the range of fairness. With information about Dole's cost savings and farm purchases, the deal price fell towards the low end of the range of fairness and may have dropped below it. The defendants also pointed to Wells Fargo's decision to withdraw from the loan syndicate as evidence that the deal price was high. Wells Fargo just as easily could have

been uncomfortable with the amount of leverage rather than the price. The number of turns of leverage that banks will fund is heavily affected by prevailing market conditions, and there were meaningful external dynamics at work in 2013, such as the "Taper Tantrum," when rates jumped in response to concern that the Federal Reserve was moderating the massive subsidy known euphemistically as Quantitative Easing. *See* Frauen 2042-43. On a company-specific level, the degree of leverage also depends on the size of the equity check, and Murdock was only committing to provide an incremental $100 million in equity. He did not actually write the check to Dole until early 2015. Given the multiple factors involved, Wells Fargo's apparent discomfort with Murdock's preferred financing package does not indicate that the price was fair.

### 3. The Unitary Determination Of Fairness

"The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness . . . ." *Tremont I*, 1996 WL 145452, at *8. "This judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case." *Technicolor Plenary III*, 663 A.2d at 1140.

In my view, Carter's conduct rendered the Merger unfair. He engaged in "fraud, misrepresentation, self-dealing, [and] gross and palpable overreaching." *Weinberger*, 457 A.2d at 714. Assuming for the sake of argument that the $13.50 price fell within a range of fairness, the plaintiffs are entitled under the circumstances to a "fairer" price. *Reis*, 28 A.3d at 466. This is because by engaging in fraud, Carter deprived the Committee of its ability to obtain a better result on behalf of the stockholders, prevented the Committee

82

from having the knowledge it needed to potentially say "no," and foreclosed the ability of the stockholders to protect themselves by voting down the deal.[29]

## B.      The Liability Of The Fiduciary Defendants

A ruling that a transaction is not entirely fair does not automatically result in liability for the defendants. "The entire fairness test seeks to determine whether directors complied with their fiduciary duties." *Reis*, 28 A.3d at 465. The test "has only a crude and potentially misleading relationship to the liability any particular fiduciary has for involvement in a self-dealing transaction." *Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008) (Strine, V.C.). Directors who have breached their duties may have defenses to liability, such as exculpation under Section 102(b)(7) of the DGCL, protection due to reliance on advisors under Section 141(e) of the DGCL, or other doctrines.

Section 10.1 of Dole's certificate of incorporation provides that "[t]o the fullest extent permitted by the DGCL as the same exists or as may hereafter be amended, no director of the Corporation shall be personally liable to the Corporation or its

---

[29] *See HMG/Courtland*, 749 A.2d at 116-17 (finding that although price fell within lower range of fairness, "The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *Bomarko I*, 794 A.2d at 1184 (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts).

stockholders for monetary damages for breach of fiduciary duty as a director." Dkt. 695

Ex. A. (the "Exculpatory Clause"). Section 102(b)(7) of the DGCL provides that

> the certificate of incorporation may also contain . . . [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 *Del. C.* § 102(b)(7). The effect of a provision like the Exculpatory Clause is to protect directors from personal liability for monetary damages for a breach of fiduciary duty, except for the four categories listed in Section 102(b)(7). "The totality of these limitations or exceptions . . . is to . . . eliminate . . . director liability only for 'duty of care' violations. With respect to other culpable directorial actions, the conventional liability of directors for wrongful conduct remains intact." 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 6.02[7] at 6-18 (2013).

When a corporation has an exculpatory provision and a self-dealing transaction has been determined to be unfair, "only the self-dealing director [is] subject to damages liability for the gap between a fair price and the deal price without an inquiry into his subjective state of mind." *Venhill*, 2008 WL 2270488, at *22. For other directors, "even the ones who might be deemed non-independent by status, the presence of the exculpatory charter provision . . . require[s] an examination of their state of mind, in order to determine whether they breached their duty of loyalty by approving the transaction in bad faith . . . , rather than in a good faith effort to benefit the corporation."

84

*Id.* at *23. "In other words, their status [as non-independent directors] is only a fact relevant to the ultimate determination whether they complied with their fiduciary duties, it is not a status crime making them a guarantor of the fairness of the transaction." *Id.* In light of the Exculpatory Clause, "[t]he liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." *Emerging Commc'ns*, 2004 WL 1305745, at *38.

### 1. Murdock

Murdock is personally liable for damages resulting from the Merger. Murdock acted in two capacities in connection with the Merger: as Dole's controlling stockholder and as a Dole director.

As this court held in *Emerging Communications*, a provision like the Exculpatory Clause "does not apply to [a defendant] in his capacity as [a] controlling stockholder." *Id.* As Dole's controlling stockholder, Murdock "breached his duty of loyalty to . . . the plaintiff shareholder class, by eliminating [Dole's unaffiliated] stockholders for an unfair price in an unfair transaction . . . . For that breach of duty [Murdock] is liable." *Id.*

Murdock is also liable in his capacity as a director. He breached his duty of loyalty by orchestrating an unfair, self-interested transaction. In addition, as the buyer, he "derived an improper personal benefit" from the transaction. *Id.* The Delaware Supreme Court recently confirmed this outcome in *Cornerstone*: As the interested party, "a finding of unfairness after trial will subject [him] to liability for breach of the duty of loyalty

85

regardless of [his] subjective bad faith." 115 A.3d at 1181; *accord Venhill*, 2008 WL 2270488, at *22.

Up to this point, this decision has not focused separately on DFC Holdings, LLC, an entity Murdock controlled and used as one of the acquisition vehicles for the Merger. Before the Merger, DFC Holdings, LLC was the sole owner of DFC Merger Corp., which merged with and into Dole. In *Emerging Communications*, this court held that the acquisition vehicles that the controlling stockholder used to effectuate an unfair freeze-out merger were liable as aiders and abetters to the same extent as the controlling stockholder. 2004 WL 1305745, at *38. The same analysis applies to DFC Holdings, LLC.

### 2. Carter

Carter is personally liable for damages resulting from the Merger. He also acted in two capacities in connection with the Merger: as a director and as Dole's President, Chief Operating Officer, and General Counsel. He is liable both as a director and as an officer.

Carter is not entitled to exculpation in his capacity as a director because he breached his "duty of loyalty to the corporation [and] its stockholders" and his acts and omissions were "not in good faith." 8 *Del. C.* § 102(b)(7). The Delaware Supreme Court has held that for purposes of the Delaware common law of fiduciary duties, these concepts elide: The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, *i.e.,* a condition, of the fundamental duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (internal quotation marks omitted). Likewise for purposes of the Delaware common law of fiduciary duties,

86

the Delaware Supreme Court has held that "acting in bad faith" and "not acting in good faith" are two sides of the same coin.[30] At a minimum, good faith requires that the decision-maker act "honestly and without pretext."[31] Bad faith involves the opposite. In its most extreme form, it involves "the conscious doing of a wrong because of dishonest purpose or moral obliquity" or "a state of mind affirmatively operating with furtive design or ill will." *McGowan v. Ferro*, 859 A.2d 1012, 1036 (Del. Ch. 2004). But it also encompasses other failures to act in good faith, including when a decision-maker "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for [the decision-maker's] duties," or when the decision-maker "intentionally acts with a purpose other than" the purpose that the decision-maker is obligated to

---

[30] *See ev3, Inc. v. Lesh*, 114 A.3d 527, 539 (Del. 2014); *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi.*, 75 A.3d 101, 110-11 (Del. 2013); *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013); *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006); *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 67 (Del. 2006). *See generally* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629 (2010).

[31] Joseph K. Leahy, *A Decade After* Disney: *A Primer on Good and Bad Faith*, 83 U. Cin. L. J. 859, 864 (2015); *accord* Strine, *supra*, at 655 (explaining that the concept of good faith encompasses a director's "honest, non-pretextual use of power"). For cases illustrating these concepts see, e.g., *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (explaining that as part of the business judgment rule, directors are presumed to act "in good faith and in the honest belief that the action taken was in the best interests of the company"); *In re Walt Disney Co. Deriv. Litig.* (*Disney I*), 907 A.2d 693, 755 (Del. Ch. 2005) ("To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation."), *aff'd*, 906 A.2d 27 (Del. 2006); *Kaplan v. Goldsamt*, 380 A.2d 556, 568 (Del. Ch. 1977) (stating that directors must act "in good faith, with honest motives, and for honest ends").

pursue.[32] A corporate fiduciary thus acts in bad faith when motivated by a purpose other than that of advancing the best interests of the corporation and its stockholders.[33]

Carter demonstrated that his primary loyalty was to Murdock, not to Dole or to its unaffiliated stockholders. Through Dole, Murdock was Carter's employer, and Carter would continue to run Dole for Murdock after the Merger. Carter knew of Murdock's buyout plans at least as early as January 2013, and he consistently acted to promote Murdock's interests. In support of Murdock's plan to privatize Dole, Carter (i) pushed down the stock price, (ii) advocated for the self-tender, (iii) participated in calls and meetings concerning Murdock's plans to launch a hostile tender offer, (iv) sought at the

---

[32] *Disney II*, 906 A.2d at 67; *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ." (quoting *Disney II*, 906 A.2d at 67)).

[33] *See Venhill*, 2008 WL 2270488, at *28 ("Howard did not act in the good faith pursuit of Venhill's best interests, as he was bound to do. Instead, he acted in bad faith by impoverishing Venhill in order to keep Auto-Trol afloat for personal reasons unrelated to Venhill's own best interests."); *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (Strine, V.C.) ("A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest. . . . The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless."); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

outset to restrict the authority of the Committee and its advisors, (v) created falsely low forecasts for the Committee to use, (vi) convened the secret Lender Meeting and lied to the Committee about his supposed compliance with the Process Letter, (vii) disregarded the Committee's instructions to terminate Deutsche Bank's access to the data room, (viii) provided advice to Murdock, Deutsche Bank, and Murdock's counsel, and (ix) started a new budgeting process using quite different and more positive assumptions and estimates without telling the Committee. Carter's vote in favor of the Merger as a director was the culmination of a course of conduct permeated by bad faith and disloyalty.

Carter also acted in his capacity as Dole's President, COO, and General Counsel. Indeed, Carter primarily interacted with the Committee as an officer. When he provided false information to the Committee and when he organized and led the Lender Meeting, Carter was acting primarily as President and COO of Dole. When he interfered with the Committee's operations in other ways, such as by trying to cabin its mandate, objecting to Lazard, insisting on having control over Dole's confidential information, and providing legal and strategic advice to Murdock, Carter was acting primarily as Dole's General Counsel. As an officer, Carter owed the same duties that he owed as a director, but the Exculpatory Clause does not protect him when acting in those capacities. *Gantler v. Stephens*, 965 A.2d 695, 709 nn.36-37 (Del. 2009).

### 3. DeLorenzo

DeLorenzo presents a close call, but I conclude that he is not liable to the plaintiffs. After the ITOCHU Transaction, DeLorenzo left Dole but remained on the Board. The plaintiffs contend that Murdock kept him there to have a guaranteed vote in

89

favor of the Merger. As evidence of DeLorenzo's allegiance to Murdock, they observe that he voted against the Committee's resolution to give it authority to appoint its own chairman—something DeLorenzo admitted did not make sense. DeLorenzo 699-701. The plaintiffs then analogize DeLorenzo's situation to Salvatore Muoio in *Emerging Communications.* 2004 WL 1305745 at *39-40. In that decision, Justice Jacobs (sitting by designation) held that a director who (i) had longstanding affiliations with the controller, (ii) was serving as a paid consultant for the controller and was seeking additional business from the controller, and (iii) continued to have financial relationships with the controller after the transaction failed to prove that he was entitled to exculpation. *Id*. Justice Jacobs observed that Muoio had special expertise that placed him "in a unique position" to know that controller's freeze-out was unfair, yet he remained silent and voted in favor of the deal.

> In these circumstances, it was incumbent upon Muoio, as a fiduciary, to advocate that the board reject the $10.25 price that the Special Committee was recommending. As a fiduciary knowledgeable of [the controlled company's] intrinsic value, Muoio should also have gone on record as voting against the proposed transaction at the $10.25 per share merger price. Muoio did neither. Instead he joined the other directors in voting, without objection, to approve the transaction.

*Id*. at *40. Justice Jacobs noted that unlike other less knowledgeable and less sophisticated directors, Muoio could not claim to have relied on the fairness opinion obtained by the committee. *Id.*

Given these facts, Justice Jacobs asked the following question: "Knowing (or at least having very strong reasons to suspect) that the price was unfair, why, then, would Muoio vote to approve the deal?" *Id.* He recognized that the possibility existed that

90

Muoio sincerely believed that the $10.25 price was minimally fair, but he observed that under Section 102(b)(7), the burden falls upon the director to show that his failure to withstand an entire fairness analysis is *exclusively* attributable to a violation of the duty of care." *Id.* (citing *Emerald II*, 787 A.2d at 98) (internal quotation marks and alterations omitted). He continued:

> The credible evidence persuades the Court that Muoio's conduct is explainable in terms of only one of two possible mindsets. The first is that Muoio made a deliberate judgment that to further his personal business interests, it was of paramount importance for him to exhibit his primary loyalty to [the controller]. The second was that Muoio, for whatever reason, consciously and intentionally disregarded his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair. If motivated by either of those mindsets, Muoio's conduct would have amounted to a violation of his duty of loyalty and/or good faith.

*Id.* (internal quotation marks and footnotes omitted). Justice Jacobs concluded that Muoio had "not established to the satisfaction of the Court, after careful scrutiny of the record, that his motivation was of a benign character." *Id.*

The plaintiffs contend that DeLorenzo, even more so than Muoio, possessed specialized knowledge about the value of Dole. He knew in particular about the cost savings available after the ITOCHU Transaction, having led the effort to identify a total of $50 million in recurring savings and given that number to the market, and he also knew about Dole's plans to buy farms. They contend DeLorenzo should have advocated against a transaction that he knew undervalued Dole and voted against the deal. They say that instead he remained silent and voted in favor of the Merger to further his relationship

91

with Murdock and because he had been well compensated by Murdock and Dole over the years.

DeLorenzo's situation resembles Muoio's in many ways. The principal distinctions are that DeLorenzo had left to work for ITOCHU, was no longer receiving remuneration from Murdock or his companies, and was not soliciting business from Murdock. At most, DeLorenzo may have felt some residual loyalty to Murdock. Importantly, DeLorenzo did not personally participate in or know about the specific misconduct in which Murdock and Carter engaged.

Ultimately what is required is an assessment of DeLorenzo's motives. "[D]ivining the operations of a person's mind is an inherently elusive endeavor." *Id.* at *40. Although the issue is close and the analogy to *Emerging Communications* is strong, I find that DeLorenzo was entitled to rely on the Committee's recommendation of the Merger. *See* 8 *Del. C.* § 141(e). I do not believe that he acted disloyally or in bad faith. He is therefore entitled to exculpation. *See* 8 *Del. C.* § 102(b)(7).

## C. The Claim For Aiding And Abetting Against Deutsche Bank

The plaintiffs seek to impose liability on Deutsche Bank for aiding and abetting Murdock and Carter's breaches of fiduciary duty. This claim has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach, and (iv) damages proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001). The finding of liability against Murdock and Carter satisfies the first, second, and fourth elements, but the third element is lacking.

92

Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability, the element of "knowing participation" requires that the secondary actor have provided "substantial assistance" to the primary violator. *Kuhns v. Bruce A. Hiler Delaware QPRT*, 2014 WL 1292860, at *21 (Del. Ch. Mar. 13, 2014). Section 876(b) of the Restatement (Second) of Torts reflects this requirement by making a secondary actor liable "[f]or harm resulting to a third party from the tortious conduct of another" if the secondary actor "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876(b) (1979); *see Anderson v. Airco, Inc.*, 2004 WL 2827887, *2-3 (Del. Super. Nov. 30, 2004).

A court's analysis of whether a secondary actor "knowingly" provided "substantial assistance" is necessarily fact intensive. Illustrative factors include the following:

- The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects;

- The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;

- The nature of the relationship between the secondary and primary actors; and

- The secondary actor's state of mind.

The list is drawn from and expands on factors that appear in *Kuhns*, which drew its list from *Patton v. Simone*, 1992 WL 398478, *12 (Del. Super. Dec. 14, 1992).

In the current case, the plaintiffs did not prove that Deutsche Bank knowingly participated in the breaches of duty giving rise to fiduciary liability. The critical breaches

93

of duty involved fraud regarding Dole's cost-cutting and purchases of farms. The tortious conduct was serious, its wrongfulness was clear, and the extent of the consequences was obvious, but Deutsche Bank did not know about or participate in those acts. Deutsche Bank did not make any of the misrepresentations, was not present for them, and did not conceal information from the Committee. Deutsche Bank was not directly involved, nor even secondarily involved, in the critical breaches of duty.

Deutsche Bank did participate directly in the Lender Meeting, but the plaintiffs did not prove that Deutsche Bank knew about the Process Letter or that the meeting violated its terms. A sophisticated firm like Deutsche Bank doubtless would have expected the Committee and its advisors to establish protective procedures such as those set forth in the Process Letter, and if the Deutsche Bank representatives had pondered whether the Committee had authorized the meeting, then they likely would have found it suspicious that Lazard and possibly Conrad and other Committee members were not in attendance. But even then, Carter and his team might have provided the same information to the Committee and Lazard separately. Deutsche Bank did not have any reason to think that the information it received at the Lender Meeting was different than the information that the Committee received.

The most that can be said is that the Deutsche Bank professionals who attended the meeting might have had some reason to be concerned that something may have been amiss. For that purpose, it is important to consider that when the Lender Meeting took place, Deutsche Bank was acting as Murdock's advisor and lead financier. Given that role, I do not believe it was Deutsche Bank's job to call the Committee, its counsel, or

94

Lazard to make sure everything was OK.[34] The fault lay with Dole's officers and employees, principally Carter, who owed their duties to Dole and, for purposes of Murdock's offer, reported to and acted under the direction of the Committee. The same analysis applies to Deutsche Bank's access to the Committee's data room and its communications with Carter, Potillo, and other Dole officers.

The plaintiffs take a broader view of Deutsche Bank's culpable conduct. They argue that Deutsche Bank should be liable for acting as Murdock's *de facto* advisor, advancing his interests, and assisting him with preliminary planning for the freeze-out beginning in 2012. The plaintiffs emphasize the periods when the bank was formally advising Dole on the strategic business review and the ITOCHU Transaction, but they also stress the months from January through May 2013 when Deutsche Bank was communicating regularly with Carter, Potillo, and other Dole officers to help plan the freeze-out.[35] The plaintiffs complain that Deutsche Bank knowingly received confidential Dole information that it used to help Murdock plan the freeze-out and to advance his interests on other matters.

This theory might present problems for Deutsche Bank if it constituted an inherent breach of duty for a director or officer to share Dole's confidential information with a

---

[34] Of course, had they done so, it would have been commendable and insulated them from any risk of liability relating to the meeting.

[35] *See* Murdock 132-33, 248-60, 262-269, 286-290; Carter 950, 954; Grellier 2149-2165, 2197-2202; JX 173; JX 244; JX 393; JX 394; JX 396; JX 404; JX 476; JX 478; JX 1634; JX 1670; JX 1671.

substantial stockholder without Board authorization. In his capacity as a director and Dole's *de facto* controller, and later as its CEO, Murdock had complete access to Dole's confidential information. Because Murdock was also Dole's controlling stockholder, and because he is a human being with only one brain, in practice he was necessarily and constantly sharing that information with himself in his stockholder capacity. He went further by sharing Dole's confidential information with his personal advisors, such as Deutsche Bank, Griswold, and his counsel at Paul Hastings, during periods when they were advancing his personal interests as a stockholder. At Murdock's direction, other Dole fiduciaries, like Carter and Potillo, also shared confidential information and participated in discussions with Deutsche Bank, Griswold, and Paul Hastings. If Murdock had been a third party unaffiliated with Dole, rather than its dominant investor, no one from Dole would have been sharing this information with him and his advisors. At a minimum they would not have received information without Board approval and a confidentiality agreement.

In my view, a fiduciary sharing of information with an affiliated stockholder and its advisors, standing alone, is not inherently a breach of duty.[36] It depends on what the

---

[36] *See Kalisman*, 2013 WL 1668205, at *6; *Kortum v. Webasto Sunroofs, Inc.,* 769 A.2d 113, 121 (Del. Ch. 2000); *KLM v. Checchi*, 1997 WL 525861, at *2-3 (Del. Ch. July 23, 1997); *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307444, at *5 (Del. Ch. June 4, 1996); *AOC Ltd. P'ship v. Horsham Corp.*, 1992 WL 97220, at *1 (Del. Ch. May 5, 1992); *see also Schoon v. Smith*, 953 A.2d 196, 208 (Del. 2008) (holding that director lacked standing to sue derivatively because stockholder he represented could bring suit, which only could happen if director was able to share information with affiliated stockholder). For discussions of the nuanced issues raised by information sharing and the difficulties of a bright-line rule that either permits or prohibits sharing,

provider and recipients do with the information, including whether they use the information to the detriment of the corporation and its stockholders or to benefit themselves improperly.[37] Under existing law, it does not seem to me that the information sharing and preparatory activities in which Murdock engaged, including Deutsche Bank's consultations with Dole officers and its use of Dole's confidential information for preliminary takeover planning, rose to the level of breach.[38] Of course, just as the law

---

see J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 54-57 (2015); Cyril Moscow, *Director Confidentiality*, 74 L. & Contemp. Probs. 197 (2011), and Catherine G. Dearlove & Jennifer J. Barrett, *What To Do About Informational Conflicts Involving Designated Directors*, 57 Prac. Law. 45 (2011).

[37] *See, e.g., Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary t*o profit personally* from the use of information secured in a confidential relationship.") (emphasis added)*; Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7-8 (Del. Ch. 1949) ("A fiduciary is subject to a duty to the beneficiary not *to use on his own account* information confidentially given him by the beneficiary or acquired by him during the course of or on account of the fiduciary relation or in violation of his duties as fiduciary, *in competition with or to the injury of the beneficiary*, . . . unless the information is a matter of general knowledge." (internal quotation marks omitted; emphasis added)); *Holdgriewe v. Nostalgia Network, Inc.*, 1993 WL 144604, at *6-7 (Del. Ch. Apr. 27, 1993) (Allen, C.) (limiting director's ability to share information directly or through advisors where he was affiliated with entity engaged in active litigation against corporation); *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 130 (Del. Ch. 1969) (same; noting that a remedy for breach of fiduciary duty would exist if the director seeking inspection were to "abuse his position as director [by making] information available to persons hostile to the corporation or otherwise not entitled to it").

[38] Imagine an alternative history in which Murdock not only mimicked *MFW*'s form but adhered to its substance. Under those circumstances, the Committee would have had full access to accurate information about the Company, could have bargained with Murdock on an informed and arm's length basis, and could have agreed to a deal or, if it concluded that Murdock was not willing to pay a fair price or that there were better alternatives available for Dole and its stockholders, said no. By stepping back from his

could have a bright-line anti-sharing rule, it could have a bright-line rule against unauthorized bid preparations by insiders. Indeed, such a rule likely follows from a strong-form anti-sharing rule. Under such an approach, the law would require a controller like Murdock (or a manager considering an LBO) to act like a third-party bidder. Before a third-party bidder can legitimately access confidential information about its target, it has to approach the company and obtain permission. A controller or manager would have to do the same. Under such a regime, an advisor who consciously assisted a fiduciary in preparing an as-yet unauthorized bid would have knowingly participated in the breach. If the company or its stockholders suffered harm, as they did here, then the advisor would be jointly and severally liable. But our law does not appear to me to have adopted a bright-line position. The use and sharing of information is rather another context-dependent inquiry.

If I am incorrect and Murdock's sharing and use of Dole's confidential information was prohibited, then Deutsche Bank knowingly participated in the breach. Under the first illustrative factor, Deutsche Bank knew that it was receiving confidential information from Murdock, Carter, Potillo, and other Dole insiders, and it used the information to assist Murdock in planning for the freeze-out and on other issues that

---

controller role and disabling himself at the Board and stockholder level when he made his initial proposal, Murdock would no longer have stood on both sides of the transaction, the Committee could have performed its function effectively, and the stockholders could have protected themselves at the ballot box. It does not seem to me that under those circumstances, Murdock would be thought to have breached his fiduciary duties by making preparations for his offer and enlisting Deutsche Bank's assistance.

affected his personal interests as a stockholder. Deutsche Bank's assistance was prolonged and extensive. At all stages, its relationship with the primary actors was problematic. Deutsche Bank took pains at trial to stress that at many points when it was receiving and using this information, it was not working for Dole. During those periods, Deutsche Bank knew it should not have access to Dole's confidential information. At other times, Deutsche Bank was serving as a common law agent and owed a duty of loyalty to Dole.[39] During those periods, Deutsche Bank should have been focused on promoting Dole's interests. It should not have been using Dole's confidential information to advance Murdock's interests.

But to reiterate, I do not believe that the preparatory activities amounted to a breach on the facts of this case, nor that any actions by Deutsche Bank while its loyalties were divided resulted in harm. In my view, the scope of Deutsche Bank's exposure to liability depends on their knowing participation in the breaches of duty that gave rise to causally related damages, namely Carter's interference with and fraudulent misrepresentations to the Committee. The aiding and abetting claim against Deutsche Bank therefore fails.

---

[39] *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *7 (Del. Ch. Feb. 12, 1990); *see* Restatement (Third) of Agency § 1.01 & cmt. b (2006); William W. Bratton & Michael L. Wachter, *Bankers and Chancellors*, 93 Tex. L. Rev. 1, 31 (2014). As Professors Bratton and Wachter discuss, a common law agency relationship is contractable, subject to certain outer limits. Because Deutsche Bank does not face liability even under a traditional common law relationship, this decision does not parse the potential implications of provisions in Deutsche Bank's engagement letters.

## D.     Damages

Once a breach of duty has been established, this court's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate . . . ." *Weinberger*, 457 A.2d at 714. At that point, the remedy could be a damages award equal to the fair value of the shares, but "the measure of any recoverable loss . . . under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 371 (Del. 1993). "In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages." *Bomarko II*, 766 A.2d at 440. The award may include "elements of rescissory damages" if the court "considers them susceptible of proof and a remedy appropriate to all the issues of fairness" presented by the case. *Weinberger*, 457 A.2d at 714. An award exceeding the fair value of the plaintiffs' shares may be appropriate "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved." *Id.*

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe v. CERBCO, Inc. (Thorpe II)*, 676 A.2d 436, 445 (Del. 1996). Damages must be "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006). But as long as that connection exists, "[t]he law does not require certainty in the award of damages where a wrong has been

100

proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." *Red Sail Easter Ltd. P'rs v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at \*7 (Del. Ch. Sept. 29, 1992) (Allen, C.). "[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at \*12 (Del. Ch. Oct. 29, 1993).

In a plenary breach of fiduciary duty action, "the court can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship." *Gesoff*, 902 A.2d at 1154. "Once disloyalty has been established, the standards evolved in *Oberly v. Kirby* and *Tri-Star* require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct." *Thorpe II*, 676 A.2d at 445 (citing *Oberly*, 592 A.2d at 463, and *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 334 (Del. 1993)).

> The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

*Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

As discussed, on the facts presented, the stockholders are not limited to an arguably fair price. They are entitled to a fairer price.

The Committee Projections and Lazard's analysis, with adjustments for the areas where Murdock and Carter misled the Committee, provide the best insight into Dole's business and its value at the time of the Merger. Because uncertainties in damages calculations are resolved against the wrongdoer, these items could support an award of damages as high as $6.84 per share, consisting of $3.80 per share for the delayed cost-cutting and $3.04 for the concealed projections about farm purchases. But while such a finding is possible, it would treat all of the upside from those initiatives as certain and would assume that the Committee could extract 100% of the incremental benefits from Murdock. If the goal of awarding damages in a case involving a breach of the duty of loyalty is to extinguish "all possibility of profit," then imposing that figure on Murdock and Carter is what the law demands.

To my mind, however, that level of damages seems unrealistic and harsh, except as a form of rescissory damages.[40] The cost-saving initiatives and the purchases of new

---

[40] Because Carter engaged in fraud, rescissory damages could be justified on these facts, and there is evidence suggesting that damages of $6.84 per share would not be unwarranted. Carter testified that Dole not only met its budget for 2014, but that it had exceeded that budget by "quite a bit." Carter 994. At trial, the plaintiffs introduced evidence showing that Dole reached $196.5 million in adjusted EBITDA in just the first three quarters of 2014, more than what was forecasted in the Committee Projections for the entire year. JX 923 at 4; Carter 993-95; *cf.* JX 783 at 22 (showing that the Committee Projections forecasted $189 in EBITDA in 2014). Supposedly to contradict this evidence, the defendants sought to introduce just one of the monthly comprehensive management reporting packages for 2014, called the "Tuesday Package," even though Dole previously moved for a protective order to avoid producing those documents. *See* Tr. 2072-73. After the plaintiffs objected and I ordered the production of the remaining Tuesday Packages from 2014, the defendants withdrew the lone Tuesday Package from evidence. Despite my ruling, *the defendants never produced the other Tuesday Packages*, yet they continued to rely on Carter's unsupported testimony about the withdrawn Tuesday

102

farms were riskier and less certain than Dole's established business, so it overvalues the incremental cash flows from these sources to treat them as being just as certain as the cash generated by Dole's core operations. This opinion therefore incorporates more modest cost savings and benefits from farm purchases. Dole's Management High Case assumed $14.8 million in incremental cost savings. Carter 908; *see* JX 783 at 21 (rounding to $15 million). The number was adopted by Seth Ferguson, one of the defendants' experts. JX 1593 at 72. It provides a reasonable middle-ground estimate of the likely benefits of additional cost-cutting. Lazard's sensitivity table implies that $14.8 million in cost savings would be worth $1.87 per share.

For the farm purchases, this decision adopts the plaintiffs' ask. Rather than seeking the full $100 million in farm purchases that Carter identified at the Lender Meeting or which Dole otherwise appears to have planned, the plaintiffs only sought to incorporate $28.6 million. As discussed above, that investment in farms would be worth an additional $0.87 per share.

---

Package. The natural inference is that the Tuesday Packages would have supported an even higher damages award based on rescissory principles. *See Lynch*, 638 A.2d at 1119 n.7 ("The production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse."); *accord Smith v. Van Gorkom*, 488 A.2d 858, 879 (Del. 1985); *Chesapeake Corp. v. Shore,* 771 A.2d 293, 301 & n.7 (Del. Ch. 2000) (Strine, V.C.). Ironically, one of the defendants' main themes during post-trial argument was that the plaintiffs had "cherry-picked" their evidence.

These more modest estimates add $2.74 per share to Lazard's DCF valuation range, increasing it to $14.14 to $16.82 per share. The midpoint of the adjusted range, which is $15.48 per share, approximates the result of an arm's length negotiation between parties having equal information. The result is a price $1.98 per share higher than the $13.50 per share Murdock paid. But because the defendants engaged in fraud, and in light of the Delaware Supreme Court's guidance regarding damages calculations for loyalty breaches, the plaintiffs are entitled to the full incremental $2.74 per share in damages.

The resulting damages award implies a fair value for Dole of $16.24, significantly less than the maximum of $20.34 per share the responsible estimate standard could support. The $2.74 per share figure suggests that Murdock and Carter's pre-proposal efforts to drive down the market price and their fraud during the negotiations reduced the ultimate deal price by 16.9%. This result matches the findings of one study in which the data supported an average price decrease of 18.6% caused by earnings manipulation before management-led buyouts. *See* Wu, *supra*. Another way to evaluate the award is to start with the market price after the ITOCHU Transaction, when Dole's stock traded above $14.00 per share. By the time Murdock made his offer, the price had declined to $10.20 per share, in part because of Carter's actions. The award of $16.24 represents a 16.0% premium over the trading price of $14.00 per share, which is relatively modest.[41]

---

[41] *See, e.g.*, FactSet, *US M&A News and Trends* (July 2015), http://www.factset.com/websitefiles/PDFs/flashwire/flashwire_7.15 (reporting an average deal premium between 30% and 40% in the third quarter of 2013, when the freeze-out was negotiated); Jens Kengelbach & Alexander Roos, Boston Consulting Gp., *Riding the Next Wave in M&A* 12 (2011) (finding an average deal premium of 26% between 1990

"[A] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues." *Summa Corp. v. TransWorld Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988). Pre- and post-judgment interest will accrue at the legal rate, fluctuating with the underlying Federal Discount Rate and compounded quarterly, until the date of payment.[42]

## E. The Appraisal Proceeding

The appraisal claimants seek the fair value of their shares. They are also members of the Class and are entitled to the remedy provided by this decision. Because they are only entitled to a single recovery, the damages award potentially renders the appraisal claim moot. The appraisal proceeding could regain its relevance, however, if the appraisal claimants did not receive complete relief from Murdock, Carter, and DFC Holdings, at which point they would have reason to proceed against Dole. But because Dole is owned indirectly by Murdock through DFC Holdings, a separate remedy against Dole may not have incremental utility.

---

and 2010 in a sample of approximately 26,000 transactions); Gregg A. Jarrell, James A. Brickley & Jeffry M. Netter, *The Market for Corporate Control*, 2 J. Econ. Persp. 49, 51 (1988) (finding average historical deal premiums ranging from 19% to 35% in different decades).

[42] *See 6 Del. C.* § 2301(a); *Levey v. Browstone Asset Mgmt., LP*, 2014 WL 4290192 (Del. Ch. Aug. 29, 2014) (explaining rationale for fluctuating rate); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *13 (Del. Ch. July 25, 2003) (using quarterly compounding interval for legal rate "due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly").

The issue may also be moot because this court held in *Emerging Communications* that both acquisition vehicles used by the controller to effect an unfair privatization—both the parent company and the merger subsidiary—were liable to the same degree as the controller. *See* Part B.1, *supra*. Through DFC Holdings, Murdock caused DFC Merger Corp. to merge with and into Dole, which thereby became liable for DFC Merger Corp.'s obligations. *See* 8 *Del. C.* § 259(a).

It may be that the parties can resolve these issues in the first instance. Rather than burdening an overly long opinion with further analysis of appraisal and its contingent relevance, the parties shall meet and confer about whether further rulings are necessary.

## III.    CONCLUSION

Murdock, his entity DFC Holdings, LLC, and Carter are liable for breaches of their duty of loyalty in the amount of $148,190,590.18. DeLorenzo and Deutsche Bank are not liable to the plaintiffs. The parties will confer and advise the court as to any issues that remain to be addressed.